Arnold WHITE, Plaintiff–Appellant,

v.

**BFI WASTE SERVICES, LLC,**
Defendant–Appellee.

Delbert Gaskins, Plaintiff–Appellant,

v.

**BFI Waste Services, LLC,**
Defendant–Appellee.

Nos. 03–1833, 03–2020.

United States Court of Appeals,
Fourth Circuit.

Argued: June 3, 2004.

Decided: July 14, 2004.

**ARGUED:** Christopher Edwin Brown, Alexandria, Virginia, for Appellants. Abbey Gail Hairston, Seyfarth Shaw, Washington, D.C., for Appellee. **ON BRIEF:** Edwin C. Brown, Jr., Brown, Brown & Brown, P.C., Alexandria, Virginia, for Appellants. Christina S. Pignatelli, Seyfarth Shaw, Washington, D.C., for Appellee.

Before LUTTIG and KING, Circuit Judges, and BEEZER, Senior Circuit Judge of the United States Court of

Affirmed in part, reversed in part, and remanded by published opinion. Judge

LUTTIG wrote the opinion, in which Judge KING and Senior Judge BEEZER joined.

LUTTIG, Circuit Judge:

Appellants Delbert Gaskins and Arnold White, who are black, are employed as "roll-off" drivers for defendant-appellee BFI Waste Services (BFI). Appellants' jobs primarily entail picking up the refuse containers of BFI's clients, emptying the containers at one of several dump sites, and returning the containers to the clients.

In actions below that were brought separately but by the same attorneys, Gaskins and White both sued BFI, raising claims of racial discrimination in employment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and under 42 U.S.C. § 1981. In particular, appellants claimed that they were subjected to discriminatory treatment in compensation because supervisors repeatedly cut their "pay codes" and the codes of other black employees, meaning that appellants received less pay per waste-service route than similarly-situated white drivers. Appellants also claimed that frequent use of derogatory terms toward black employees by supervisors created a hostile work environment.

After discovery, the district courts in each of the cases below granted summary judgment to BFI. We affirm these grants of summary judgment with respect to the claims of discrimination in compensation, but reverse with respect to appellants' hostile work environment claims.

## I.

At the outset, we address the one respect in which the paths of these two consolidated cases diverged below.

■ After White filed his complaint, but before the commencement of discovery,

the district court in White's case granted BFI's motion to dismiss White's section 1981 claims insofar as they concerned acts which occurred before December 19, 2000, two years prior to the filing of White's complaint in district court. The court also granted BFI's motion to dismiss White's Title VII claims insofar as they concerned acts which occurred before September 6, 2001, 300 days prior to White's filing of an EEOC charge before bringing his employment discrimination claim in the district court. J.A. 17–18. Because White does not contest factual findings made by the district court in granting BFI's motion to dismiss on statute of limitations grounds, but only argues that the district court committed errors of law, we review the district court's grant of BFI's motion to dismiss *de novo*. See *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1398 (4th Cir.1993).

### A.

We turn first to the district court's dismissal of White's section 1981 claims insofar as they were "based upon acts" that occurred two years before White filed his complaint. J.A. 18. In ordering the dismissal of these claims, the district court relied upon this circuit's decision in *McCrary v. Runyon*, 515 F.2d 1082, 1096–97 (4th Cir.1974), *aff'd*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), which held that *all* section 1981 claims brought in Virginia are subject to the two-year Virginia statute of limitations for personal injury borrowed from Virginia Code § 8.01–243(a). This is no longer the law.

■ In a decision released less than two months ago, *Jones v. R.R. Donnelley & Sons Co.*, —— U.S. ——, 124 S.Ct. 1836, —— L.Ed.2d —— (2004), the Supreme Court held that claims arising under the 1991 amendments to section 1981 are governed by the four-year federal statute of

limitations set forth in 28 U.S.C. § 1658. Section 1981 claims based upon conduct occurring after the formation of an employment contract, including hostile work environment claims and claims of discrimination in compensation like the ones raised here, arise under the 1991 amendments. *Id.* at 1840; *see also James v. Circuit City Stores, Inc.,* 370 F.3d 417 (4th Cir.2004). Accordingly, White's section 1981 claims are subject to the four-year statute of limitations in section 1658 and are thus timely to the extent they are based upon acts that occurred after December 19, 1998.

Because White's hostile work environment claim is limited to conduct that is alleged to have occurred after this date, *see* J.A. 12, no portion of that claim is time-barred. Additionally, to the extent White's claims of discrimination in compensation under section 1981 are based on acts that occurred after Dec. 19, 1998 but before Dec. 19, 2000 (the cut-off date that the district court chose), they must also be remanded for further proceedings.

## B.

■ For Title VII claims, with respect to which a plaintiff first must file a charge with the EEOC before bringing suit in district court, a plaintiff can only complain of discrimination that "occurred" within either the 180–day period or the 300–day period immediately preceding the filing of the EEOC charge. 42 U.S.C. § 2000e–5(e) (2003). The 300–day period, rather than the 180–day period, applies where, as here, state law also proscribes the alleged employment discrimination and the plaintiff files with a state or local employment discrimination agency either before filing with the EEOC, or concurrently therewith. *See id.; see also Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 442 (4th Cir. 1998).

White filed his individual charge of discrimination with the EEOC on July 3, 2002. J.A. 43. Accordingly, at first blush the district court appears to have done nothing more than faithfully follow the applicable rules when it granted BFI's motion to dismiss and thus limited White's Title VII claims to events occurring after September 6, 2001 (300 days prior to the date on which White filed his EEOC charge).

White nonetheless argues that the district court erred in so limiting his Title VII claims, for two reasons. First, White contends, the district court failed to recognize that under the Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), a hostile work environment claim under Title VII can encompass racially hostile acts that occurred even beyond the applicable limitations period, as long as at least part of the hostile work environment to which those acts contributed took place within the limitation period. Second, White asserts, the district court should have used an earlier EEOC filing in February 2000, and not White's own EEOC filing, as the appropriate reference point for determining the limitations period for White's Title VII claims, because the earlier EEOC charge was filed by White's co-employees and raised substantially similar claims.

### 1.

■ The first contention pressed by White is not without force. In *Morgan,* the Supreme Court held that while a Title VII plaintiff seeking to recover for discrete acts of alleged discrimination may complain only of those acts that occurred within the relevant limitations period, a Title VII plaintiff seeking to recover for a hostile work environment can recover for acts occurring even beyond that period, as long

as at least a portion of the hostile work environment occurred within the relevant limitations period. *Id.* at 122, 122 S.Ct. 2061. The district court, without citing *Morgan* and seemingly without recognizing its holding, limited all of White's Title VII claims to "acts" occurring after September 6, 2001.

■ With respect to White's claims of discriminatory pay-code cuts, this ruling was correct. Each such pay-code cut is a discrete act that would be actionable under Title VII by itself, as appellants' counsel conceded at oral argument. *See id.* at 112, 122 S.Ct. 2061 (citing with approval the Supreme Court's earlier statement in *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (per curiam), that with respect to salary discrimination, "each week's paycheck that deliver[s] less to a black than to a similarly situated white is a wrong actionable under Title VII"). And accordingly, under *Morgan,* White is appropriately barred under Title VII from complaining of any pay-code cut that occurred prior to September 6, 2001.

With respect to White's hostile work environment claim, however, the district court's ruling was incorrect. Under *Morgan,* this claim may appropriately extend even to acts that occurred before the relevant limitations period, because the hostile work environment continued within the limitations period as well. *See id.* at 118, 122 S.Ct. 2061. Accordingly, the district court erred in limiting White's hostile work environment claim under Title VII to acts that occurred after September 6, 2001.

### 2.

White next argues that the district court erred with respect to the date it used to determine the 300–day limitations period for his Title VII claims. According to White, the district court should have used a filing with the EEOC by other employees in February 2000, and not White's own filing with the EEOC in July 2002, as the relevant date, because White's claims are substantially related to those raised in the earlier EEOC charge filed by other employees. We do not agree.

■ White grounds his attempt to obtain the benefit of the earlier filing date in a doctrine, which has not yet been adopted in this circuit, known as the "single-filing rule." *See Appellant's Br.* at 19. The "single-filing rule," as applied by those circuits which have adopted it, allows plaintiffs who have not exhausted the administrative requirement of filing with the EEOC to *join* in a lawsuit with other plaintiffs who have exhausted the requirement, provided that all plaintiffs' claims are substantially similar and that the EEOC charge itself gave notice of the charge's collective nature. *See, e.g., Bettcher v. Brown Schools, Inc.,* 262 F.3d 492, 494–95 (5th Cir.2001) (setting forth the requirements for invocation of the "single-filing rule"); *Tolliver v. Xerox Corp.,* 918 F.2d 1052, 1056 (2d Cir.1990) (same); *see also Dalton v. Employment Security Comm'n,* 671 F.2d 835, 838 (4th Cir.1982) (noting that the Fifth Circuit had applied such a rule in *Crawford v. United States Steel Corp.,* 660 F.2d 663, 665–66 (1981), but noting also that the Ninth Circuit had declined to apply such a rule in *Inda v. United Air Lines, Inc.,* 565 F.2d 554, 558–59 (9th Cir.1977)). By its terms, this rule would be entirely inapplicable here even if our circuit were to adopt it: White simply has not *joined* in a lawsuit brought by those plaintiffs who filed the earlier EEOC charge from which White would like to benefit. *Cf. Bettcher,* 262 F.3d at 495 (rejecting a plaintiff's attempt to invoke the "single-filing rule" because the individual who filed the EEOC charge did not him-

self bring suit). Rather, White has brought suit on his own behalf.

What White truly seeks is not to invoke the "single-filing rule," but some form of "relation back" between his claim and the earlier EEOC charge filed by other employees. *Cf.* Fed.R.Civ.P. 15(c) (setting forth conditions under which an amendment of a pleading "relates back" to the date of the original pleading). But other than the "single-filing rule," which is inapplicable for the reasons stated above, White can muster no legal authority on which any relation back would rest, under the circumstances here presented. Again, White did not formally join the earlier EEOC charge or any civil complaint brought thereafter with respect to that EEOC charge. Instead, White filed his own charge of discrimination with the EEOC, received his own "right-to-sue" letter, and subsequently brought his own, separate claim in district court. Accordingly, as required by statute, and as the district court correctly determined, the date on which White's own EEOC charge was filed is the date with respect to which any limitation of White's Title VII claims must be determined. 42 U.S.C. § 2000e–5(e).

\* \* \* \* \* \* \* \* \*

In sum, in light of the Supreme Court's recent decision in *Jones*, we reverse the district court's application of a two-year statute of limitations to White's section 1981 claims, and remand for further proceedings those claims that the district court erroneously held to be time-barred. We affirm the district court's limitation of White's Title VII claims of disparate treatment in compensation, because those claims rely on "discrete acts" of discrimination under *Morgan*. But we reverse the district court's limitation of White's Title VII hostile work environment claim to events that occurred after September 6, 2001.

## II.

We now turn to the grants of summary judgment in favor of BFI with respect to both appellants' claims of racial discrimination in compensation. We review these grants of summary judgment *de novo*, viewing all facts in the light most favorable to, and drawing all justifiable inferences in favor of, the appellants. *Love–Lane v. Martin*, 355 F.3d 766, 775 (4th Cir.2004).

Understanding appellants' claims of discrimination in compensation requires a brief overview of the BFI compensation system. "Roll-off" drivers, such as White and Gaskins, are paid a fee for each route they drive. The amount of the per-route fee is dictated by a "pay code" letter.[1] The pay code for each route, in turn, is determined with reference to the average time it takes to complete a route.

When BFI drivers report to work at the beginning of each day, they receive computer-generated route sheets. In most cases, the pay code for a particular route is generated by the computer and printed in advance on the route sheet that the driver receives (the only exception to this rule is apparently in cases where a client is new, such that no pay code has been generated). When drivers complete their routes, they also write in the route pay codes in a blank next to each route entry on their sheets. Supervisors then review the route sheets once they are submitted to make sure that the written-in route pay codes correspond to the computer-generated route pay codes. Additionally, if unusual circum-

---

1. The pay code letters are A, B, C, D, E, and F. The amount of the per-route fee increases from A to F, with the surprising exception that "D" is actually the lowest of the pay codes.

stances make the computer-generated route pay code inappropriate, supervisors may authorize a different pay code.

The substance of appellants' claim for racial discrimination in compensation is that appellants' supervisors repeatedly altered their self-reported pay codes (as well as those of other black employees), resulting in lower compensation per route, but that those supervisors did not alter the pay codes of similarly-situated white drivers.

■ As the district courts noted and as appellants here do not contest, appellants have no direct evidence that BFI intentionally discriminated against them on the basis of race with respect to compensation. Thus, in order to establish a prima facie case of racial discrimination in compensation under either Title VII or section 1981, appellants needed to show: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action with respect to compensation; and (4) that similarly-situated employees outside the protected class received more favorable treatment. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Love-Lane,* 355 F.3d at 786–87; *Causey v. Balog,* 162 F.3d 795, 804 (4th Cir.1998).

Both district courts granted summary judgment to BFI, holding that, despite appellants' membership in a protected racial class and concededly satisfactory job performance, appellants failed to produce evidence from which a reasonable jury could conclude that similarly-situated white employees received more favorable treatment. *White* J.A. 273–74; *Gaskins* J.A. 329–30. Our *de novo* review of the record before the district courts convinces us that the district courts below did not err in granting summary judgment on this basis.

In the overwhelming majority of instances in which Gaskins' or White's pay codes were changed, they were changed because Gaskins or White had themselves put down a better pay code than the one that the computer had already generated. *See, e.g., White* J.A. 56–59 (showing numerous instances in which White wrote in a pay code one level better than the computer-generated code, *e.g.,* "C" instead of "B", and in which the supervisor then changed the code back); *Gaskins* J.A. 62–67 (same). The record also shows that supervisors handled similar behavior by white drivers in the same manner, that is, by lowering the pay code to the presumptively-appropriate computer-generated one. *See, e.g., White* J.A. 61–72 (showing numerous instances in which white drivers wrote in a pay code one level better than the computer-generated one, and in which the supervisor then changed the pay code back). And the record shows that at least one white driver even complained to the supervisors regarding pay-code cutting. *White* J.A. 26 (identifying the driver as white), 153–54; *Gaskins* J.A. 95–96. Given this evidence, no reasonable jury could conclude that BFI treated white drivers more favorably than black drivers with respect to compensation for truck routes. The only reasonable inference to be drawn is that it was common practice at BFI for white and black drivers alike to write in slightly better pay codes than the ones to which they were entitled, and for supervisors to lower these codes back down.[2]

---

**2.** Appellants also argue that it was improper for the courts below to deny their motions under Federal Rule of Civil Procedure 56(f) for relief from summary judgment and for additional time to conduct discovery, which motions appellants presumably made in implicit recognition of the sparsity of the evidence supporting the allegation of disparate treatment in compensation. The record shows that these motions were denied be-

To be sure, plaintiffs testified in their depositions that they and other black employees had the impression that black employees' pay codes were being altered in a discriminatory manner. They also testified that supervisors had stated that they "do not like the blacks to make more than the whites" and had made comments that because particular black drivers were making too much money, they were going to have to be "cut back." *White* J.A. 121, 123; *Gaskins* J.A. 128, 130. But the only documentary evidence in the record regarding the pay codes awarded for specific routes driven by White, Gaskins and other drivers lends no support to, and in fact affirmatively contradicts, any inference that BFI supervisors did in fact treat white drivers more favorably than similarly situated black drivers.[3] While a reasonable jury could conclude that plaintiffs' impressions of discriminatory treatment were honestly held—especially in light of the derogatory terms in which BFI supervisors allegedly referred to black employees and the remarks which BFI supervisors allegedly made—a reasonable jury could not conclude, on the basis of the evidence produced by the appellants, that any specific instances of disparate treatment in compensation *actually* occurred.[4] Thus, we affirm the district courts' grants of summary judgment with respect to appellants' claims of racial discrimination in compensation.

### III.

We find more merit in appellants' claims of racial discrimination in the form of a hostile work environment. To survive summary judgment on these claims, plaintiffs needed to demonstrate that a reason-

cause the magistrate judge to whom they were submitted found that appellants had not exercised the required level of diligence in obtaining discovery during the discovery period. *White* J.A. 278 ("The discovery period for this case extended from February 11, 2003, to May 9, 2003. *Plaintiff served discovery on April 9, 2003, the last possible day to serve discovery which would be due within the Court's prescribed discovery period.*") (emphasis added); *Gaskins* J.A. 323A (same). There was no reversible error in the denial of appellants' motion on this basis. *See Strag v. Bd. of Trustees*, 55 F.3d 943, 953 (4th Cir.1995).

3. This conclusion is bolstered by the evidence that, in the aggregate, black drivers, including Gaskins and White, were among the highest paid drivers at BFI, as both district courts noted, *White* J.A. 271; *Gaskins* J.A. 329–30, and that they remained such even after the comments regarding "cutting back" black drivers were allegedly made. *See White* J.A. 51; *Gaskins* J.A. 57. It is also bolstered by the admission of appellants' counsel, at oral argument, that the evidentiary basis supporting the claims of disparate treatment in compensation was thin.

4. It is noteworthy that BFI was the only party to supply any route sheets to the district court as documentary evidence for the purposes of summary judgment. Had appellants' counsel exercised more diligence in acquiring route sheets and pay records to support his clients' position with documentary evidence of specific instances of discrimination involving similar routes for which white drivers were paid more than black drivers under like circumstances, and thus to oppose BFI's inevitable motion for summary judgment, a different result might have been required. As it happened, however, the only such evidence to which appellants purport to point on appeal was first included in appellants' *reply brief* after BFI filed its opposition to appellants' *motion for relief under 56(f)*. *See White* J.A. x, 234–38; *Gaskins* J.A. x, 248–92. Because this evidence was not before the district courts for purposes of summary judgment, but only for purposes of the motion for relief under 56(f), we cannot consider it when reviewing the correctness of the district courts' grants of summary judgment to BFI. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir.2003) (noting that when reviewing a grant of summary judgment, an appellate court is "limited to the evidence available to the [district] court at the time the motion [for summary judgment] was made").

able jury could find that they suffered workplace harassment that was "(1) unwelcome, (2) based on race, and (3) sufficiently severe and pervasive to alter the conditions of employment and create an abusive atmosphere." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir.2001). They also needed to demonstrate that "there is some basis for imposing liability" on BFI for this harassment. *Id.*

### A.

Both district courts granted summary judgment on the basis that, although some unwelcome comments based on race were made, the allegations simply did not establish that harassment was sufficiently "severe or pervasive" to give rise to an actionable hostile work environment claim. *See White* J.A. 275 ("Plaintiff has failed to allege comments or conduct so severe or pervasive as to create an abusive atmosphere."); *Gaskins* J.A. 332 ("The Court finds the alleged comments to be wholly inappropriate workplace conversation. However, under Fourth Circuit case law, these offensive and odious statements are not so severe or pervasive as to permeate the workplace, thereby not creating a hostile work environment as a matter of law.").

■ We reverse these grants of summary judgment. Our *de novo* review of the record persuades us that, contrary to the district courts' holdings, a reasonable jury could find both Gaskins and White suffered harassment that was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." *Spriggs*, 242 F.3d at 183. In particular, White testified in his deposition, which was included as part of the record in both cases below, that throughout his employment at BFI, supervisors repeatedly

called him and other black employees "boy, jigaboo, nigger, porch monkey, Mighty Joe Young,"[5] and "Zulu warrior." *White* J.A. 125, 127, 129; *Gaskins* J.A. 132, 134, 136. Nowhere in his deposition did White state that these terms were used on only a few occasions; rather, White testified that use of these terms was "just the way they speak to you at BFI, like you are less than nothing." *White* J.A. 125; *Gaskins* J.A. 132. Indeed, White specifically testified that supervisors used the term "boy" on a daily basis to refer only to black employees, and not to white ones. *White* J.A. 128, 131; *Gaskins* J.A. 135, 138.

Gaskins also testified in his deposition that one of his supervisors, upon learning that Gaskins' wife was white, told Gaskins that he did not appreciate Gaskins' "taking our white women" and that "he had a relative that was dating a black man, and that he didn't like that at all." *White* J.A. 97, 111; *Gaskins* J.A. 104, 118. And thereafter, Gaskins has alleged, this same supervisor raised the issue of Gaskins' wife repeatedly. *White* J.A. 99–100; *Gaskins* J.A. 106–07. Gaskins further stated that he overheard the same supervisor on a number of occasions referring to black female employees as "black hookers." *White* J.A. 115; *Gaskins* J.A. 122. And finally, Gaskins testified that he had heard another supervisor, when "writing up" a fellow black employee, tell that employee that he was being written up because he was "one of them." *White* J.A. 112; *Gaskins* J.A. 119.

As comparison with our earlier decision in *Spriggs v. Diamond Auto Glass* reveals, the deposition testimony of White and Gaskins described above is easily sufficient to create a triable issue of fact in both cases as to whether the harassment at BFI of black employees created an actionable hos-

---

5. "Mighty Joe Young" is a reference to a large gorilla in a recent movie of the same name.

tile work environment. In *Spriggs*, the district court had granted summary judgment to an employer on an employee's hostile work environment claim, even though the employee had testified in his deposition that his supervisor "habitually called Spriggs 'monkey,' 'dumb monkey,' and 'nigger.'" 242 F.3d at 182. We reversed this grant of summary judgment on appeal, holding that Spriggs' testimony, if believed, established the existence of an actionable hostile work environment:

> Far more than a "mere offensive utterance," the word "nigger" is pure anathema to African–Americans. "Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir.1993) (citation and internal quotation marks omitted).
>
> [The supervisor's] constant use of the word "monkey" to describe African Americans was similarly odious. To suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme. *See Walker*

*v. Thompson*, 214 F.3d 615, 626 (5th Cir.2000) (triable issue raised with regard to hostile work environment where, inter alia, supervisors verbally assailed African American employees with physically humiliating comparisons to "monkeys" and "slaves").

> [The supervisor's] frequent and highly repugnant insults were sufficiently severe or pervasive (or both) to cause a person of ordinary sensibilities to perceive that the work atmosphere at the Forestville store was racially hostile.

*Id.* at 185.

In both of the cases before us here, as in *Spriggs*, the plaintiffs have forecasted evidence that workplace supervisors repeatedly used the term "nigger" and "monkey," as well as other insulting terms, to refer to black employees. Indeed, when viewed in the light most favorable to plaintiffs, the evidence in Gaskins' and White's cases illustrates a work environment that was arguably even more racially hostile than the one alleged in *Spriggs*. Accordingly, we reverse the district courts' holdings that the evidence in the record is inadequate to support a finding that the harassment plaintiffs suffered was sufficiently severe or pervasive to give rise to a hostile work environment.[6]

---

**6.** As shown by the above discussion, both district courts failed properly to assess the import of *Spriggs* in light of the analogous evidence present here. But independent of that larger error, when considering Gaskins' hostile work environment claim the *Gaskins* district court also made three particular errors that cannot be overlooked.

First, the *Gaskins* court made a factual finding that "no one at BFI has made a racially derogatory remark to [Gaskins] or in his presence in more than three years." J.A. 333. But this finding cannot be squared with the contrary record evidence that BFI supervisors made racially derogatory remarks to all black employees, including Gaskins, within that period. *See supra* at 297–298.

Second, the *Gaskins* court emphasized that [Gaskins] has made no allegations that his bigoted supervisor or his co-workers made any physical threats against him." J.A. 333. But the fact that Gaskins was never physically threatened does not defeat his hostile work environment claim. As this court held in *Spriggs*, some words are so offensive that, when uttered repeatedly, they *can* foster "an abusive working environment" even if they are not accompanied by threat of physical injury. *Spriggs*, 242 F.3d at 185. The presence of race-based physical threats undeniably strengthens a hostile work environment claim. The absence of such, however, is in no way dispositive, when there is sufficient evidence from which a reasonable jury could

### B.

We are also convinced that a reasonable jury could find that a sufficient basis exists to impose liability on BFI.

■ Employers are generally presumed to be liable for hostile work environment harassment committed by supervisory employees. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). As we explained in *Spriggs*, however, even where a prima facie case of hostile work environment harassment has been raised, as long as no "tangible employment action" has been taken against the employee, the employer can raise an affirmative defense to the imputation of liability "if it can demonstrate, by a preponderance of the evidence, that (1) it 'exercised reasonable care to prevent and correct promptly any harassing behavior'; and (2) the plaintiff 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" 242 F.3d at 186 (citing *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). Further, this court has held that the distribution by an employer of an anti-harassment policy provides "compelling proof that the [employer] exercised reasonable care in preventing and promptly correcting harassment." *See Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir.2001).

BFI accordingly points to its anti-harassment policy, which both Gaskins and White indisputably received, and argues that, even if this court concludes that Gaskins and White have raised a prima facie hostile work environment claim, this court should still affirm the grants of summary judgment below on the basis of BFI's affirmative defense. Because, as we have already determined, plaintiffs cannot show that they suffered discriminatory treatment in terms of compensation, *supra* at 294–296, and because plaintiffs have raised no other claim of "tangible employment action" being taken against them, the affirmative defense described above is potentially available to BFI.

■ The state of the record, however, precludes us at this point from holding as a matter of law that BFI is entitled to this affirmative defense. While it is undisputed that the anti-harassment policy was distributed to BFI employees, issues of material fact exist as to whether the policy was effectively enforced and, thus, as to whether BFI has satisfied the first prong of the affirmative defense by "exercis[ing] reasonable care to prevent and correct promptly any harassing behavior." *See Barrett*, 240 F.3d at 266 (noting that any presumption of "reasonable care" arising from the distribution of an anti-harassment policy can be rebutted through proof that the policy was adopted or administered in bad faith or that the policy was otherwise defective or dysfunctional). In particular, White has testified that he complained to management numerous times about the harassment he was suffering, but that nothing ever came of these complaints because his supervisors always de-

conclude that allegedly harassing conduct was otherwise "humiliating." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Lastly, the *Gaskins* court held that "Gaskins fails to demonstrate how [BFI's] actions reasonably interfered with [Gaskins'] performance, because [Gaskins] is currently still employed by [BFI]." J.A. 333. Again, however, Gaskins' continued employment with BFI does not defeat his hostile work environment claim. One need not sacrifice one's job (and a steady source of income) in order to prove that racial harassment in the workplace rose to the level of an actionable hostile work environment.

nied making any racially derogatory remarks and management thereafter took no further action. *White* J.A. 133–34; *Gaskins* J.A. 140–41. And while Gaskins never himself complained to management, he testified that he and other employees, acting as a group, sent a representative to complain to management of the behavior of a particular supervisor, but that this representative was rebuffed with the general statement that the group "was making a big mistake" and that the supervisor "was not prejudiced." *White* J.A. 102–03; *Gaskins* J.A. 109–10. "Under these circumstances, a jury could rationally conclude that, although [BFI's] institution of an anti-harassment policy represented a reasonable step toward preventing the type of abuse suffered by [White and Gaskins], the company unreasonably failed to correct [the supervisors'] offending behavior by neglecting to enforce the policy. [The employer's] entitlement to the affirmative defense is therefore a triable issue." *Spriggs*, 242 F.3d at 188.

### C.

BFI alternatively argues that to the extent a hostile work environment existed at BFI, the evidence establishes that it existed only until a particular "roll-off" supervisor, Jay Smith, left in May 2000. Accordingly, BFI contends, recovery for this hostile work environment is time-barred both under Title VII (because May 2000 is more than 300 days prior to the dates on which either Gaskins or White filed EEOC charges) and under section 1981 (because May 2000 is more than two years prior to the dates on which either Gaskins or White brought suit in the district court).

Of course, as to appellants' section 1981 hostile work environment claims, BFI's argument has been overtaken by the Supreme Court's recent decision in *Jones v. R.R. Donnelley & Sons Co.*, 124 S.Ct. 1836 (2004), which established that the four-year federal statute of limitations set forth in 28 U.S.C. § 1658 applies to section 1981 claims based upon conduct occurring after the formation of an employment contract. Even if Gaskins or White could only prove that a hostile work environment existed up until Smith's departure in May 2000, their section 1981 hostile work environment claims would still fall within the applicable four-year limitations period. *See supra* at 291–292.

■ As to appellants' Title VII hostile work environment claims, however, the shorter 300–day limitations period means that if the alleged hostile work environment did end upon Smith's departure, any claims based upon it would be time-barred. But while it is true that much of the evidence in the record pertains to comments and remarks made by Smith, there is also evidence that other BFI supervisors made racially derogatory remarks as well, even after Smith's departure from BFI. *See White* J.A. at 125–31; *Gaskins* J.A. at 132–38; *see also supra* at 297–298. At this stage, we simply cannot declare as a matter of law that any hostile work environment at BFI dissipated upon Smith's departure. A triable issue of fact exists not only as to whether a hostile work environment existed at BFI at all, but also as to (i) whether it ceased upon Smith's departure and never commenced anew, (ii) whether it ceased upon Smith's departure but then commenced anew at some later date (in which case recovery under Title VII for the earlier hostile work environment would be time-barred, although recovery for the later hostile work environment would be permissible, *see Morgan*, 536 U.S. at 118, 122 S.Ct. 2061), or (iii) whether it existed continuously, even despite Smith's departure (in which case recovery would be permissible under *Morgan* for the entire hostile work

environment, even to the extent it concerned events outside the limitations period, *see id.*).

## CONCLUSION

For the foregoing reasons, the grants of summary judgment below are affirmed with respect to appellants' claims of racial discrimination in compensation, but reversed with respect to appellants' claims of a hostile work environment. Additionally, we reverse the grant of the motion to dismiss in the *White* case insofar as it limited White's Title VII hostile work environment claim contrary to the Supreme Court's decision in *Morgan,* and insofar as it limited White's section 1981 claims in a manner contrary to the Supreme Court's recent decision in *Jones.* These cases are now remanded for further proceedings not inconsistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*