**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 07-1251**

———————————

DOROTHY H. FREEMAN,

        Plaintiff - Appellant,

   v.

NORTH STATE BANK,

        Defendant - Appellee,

    and

LARRY BARBOUR; FORREST BALL; JAMES C. BRANCH; CHARLES T.
FRANCIS; GLENN FUTRELL; C. THOMAS HENDRICKSON; KEITH KEENER,
MD; GARY H. PENDLETON, Brigadier General; W. HAROLD PERRY;
NUTAN T. SHAH; FRED J. SMITH; JACK STANCIL; GEORGE VENTERS,
Dr.; JAMES P. BAKER, JR.; ELBERT BOYD; KENT CUMMINGS; SCOTT D.
DAWSON; DAVID FAJGENBAUM; THOMAS HENDERSON; LAMARR ROBINSON;
J. RANDALL TIDWELL; MARK ZURAWEL, Dr.; LELAND E. GARRETT, Dr.;
RONALD B. GRIDLEY; ALLYSON K. DUNCAN, Individually and as they
comprise the Board of Directors and investors of North State
Bank,

        Defendants.

———————————

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh. Terrence W. Boyle,
District Judge. (5:03-cv-00916-BO)

———————————

Argued: March 20, 2008          Decided: June 10, 2008

———————————

Before WILKINSON and KING, Circuit Judges, and C. Arlen BEAM,
Senior Circuit Judge of the United States Court of Appeals for the
Eighth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

---

**ARGUED:** Julius Chambers, FERGUSON, STEIN, CHAMBERS, GRESHAM & SUMTER, P.A., Charlotte, North Carolina, for Appellant.  L. Diane Tindall, WYRICK, ROBBINS, YATES & PONTON, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Mary M. Williams, WYRICK, ROBBINS, YATES & PONTON, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Plaintiff Dorothy H. Freeman appeals from the district court's award of summary judgment to North State Bank ("North State" or the "Bank"), her former employer, on race-based claims pursued under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. In particular, Freeman, who is African-American, alleges that North State unlawfully discriminated against her on the basis of her race in awarding her a lower annual bonus in 2002 than it paid to similarly situated white employees. She also maintains that she was discharged in retaliation for her complaints about the race-based disparity in the bonuses. As explained below, we affirm.

I.

A.

North State is headquartered in Raleigh, North Carolina, and began operations in June 2000.[1] In January 2001, Freeman was hired as a Loan Administrative Assistant ("LAA") at North State, where she helped process loans for a loan officer.[2] In 2001, Freeman's initial salary was $35,000 per year, and it increased to nearly $38,000 in 2002. During Freeman's employment with North State, the

[1]We recite the facts in the light most favorable to Freeman, as the non-moving party. See Lee v. York County Sch. Div., 484 F.3d 687, 693 (4th Cir. 2007).

[2]In addition to her regular duties as an LAA, Freeman also attended a seminar, picked up flowers, staffed the Bank's booth at a business expo, and occasionally provided customer support.

3

Bank also employed two other LAAs: Karen Kilmer and Paige Fly, both white. Kilmer had joined North State approximately six months prior to Freeman, with an initial salary of $35,000. Kilmer received raises in 2001 and 2002, resulting in an annual salary of $38,750. Fly was hired as a teller seven months after Freeman was hired, with a starting salary of $25,000. Fly was promoted to the position of LAA in January 2002, and received an increase in annual salary to $27,000 at that time.

In November 2002, Freeman, Kilmer, and Fly met with Stephen Salisbury, the Bank's Senior Vice President, for the purpose of determining who should provide administrative support for a new loan officer. At the time of the meeting, Freeman was supporting a single consumer loan officer, while Kilmer and Fly each supported two commercial loan officers. Constance Sprigg, Freeman's supervisor, has opined that commercial loans often required more work from the loan officers, but that in most cases, consumer loans required more work from the LAAs because more disclosures were required. The loan officer Freeman supported processed a larger number of loans than the Bank's other loan officers, but the consumer loans yielded a lower dollar return than the commercial loans. Prior to the November 2002 meeting, Sprigg and another Bank employee, Judy Pope, a Customer Service Representative, advised Freeman not to volunteer for the new loan officer because her "workload was at the maximum and . . . she just couldn't handle any

4

more work." J.A. 414.[3] When Salisbury asked who would provide administrative support to the new loan officer, Fly volunteered. As a result, Fly began supporting three loan officers, while Kilmer continued to support two, and Freeman supported only one.

On December 3, 2002, North State's Executive Management Team met to discuss the award of year-end bonuses to the Bank's employees. This meeting involved Larry Barbour, President and Chief Executive Officer; Chuck Washburn, Executive Vice President and Chief Credit Officer; Judy Stephenson, Executive Vice President; Kirk Whorf, Senior Vice President and Chief Financial Officer; and Sandra Temple, Senior Vice President and Chief Operations Officer. During the meeting, the Executive Management Team assessed each employee's commitment to his/her job, as well as other factors including work ethic, quality of work, and overall job performance. Considering these factors, they decided to award 2002 annual bonuses of $750 to Kilmer, $600 to Fly, and $300 to Freeman.

Shortly after North State informed its employees of their individual bonuses, Sprigg advised Freeman that her 2002 bonus was less than those paid to Fly and Kilmer. On January 8, 2003, Sprigg informed Sandra Temple, who handles human resources issues for the Bank, that Freeman was concerned about the differences in the

---

[3]Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.

5

bonuses.  The following week, on January 13, 2003, Freeman wrote to Barbour, the Bank's President and CEO, inquiring about the apparent disparity in bonuses.  Later that same day, Temple and Salisbury met with Freeman in an effort to address her concerns.

At the January 13, 2003 meeting, Temple informed Freeman that Fly had received a larger annual bonus because she volunteered to support a third loan officer.  Temple further explained that the bonuses were based on how many loan officers each LAA supported. Salisbury interrupted Temple, however, explaining that it was his understanding that the bonuses were discretionary, and not based on any fixed criteria.  Temple responded that there was more to it than that, and stated that Salisbury had not been present at the meeting when the bonuses were discussed.  Shortly after the January 13 meeting, Temple met with Freeman again and reiterated that Fly had received a larger bonus because she had volunteered to provide support to the new loan officer.

On January 21, 2003, Freeman wrote the members of the Bank's Board of Directors, complaining about her bonus for 2002.  On January 30, 2003, counsel for North State wrote a letter to Freeman responding to her concerns, informing her that the bonus decision was based on "job performance, quantity and quality of work product as well as certain intangibles such as attitude and work ethic." J.A. 257.  It explained that Fly's willingness to support three loan officers — compared to Freeman's single loan officer — was

the most important factor in the bonus decisions. The letter also reasoned that Fly's loan portfolio was more complex than Freeman's based on the types of loans that she was processing, and that Fly's work was "cleaner." Id.

On January 23, 2003 — before she had received a response to her letter to the Board — Freeman left work early, because she "just wasn't able to go the rest of the day," since she was "stressed" and "had anxiety." J.A. 229. Sprigg informed Temple that Freeman was "so distressed over the issue with the discretionary bonus, that she could not concentrate on anything else." Id. at 115. According to Dr. Gerald Blake, a physician who examined Freeman shortly thereafter, Freeman was suffering from "severe job-related emotional stresses that prevent[ed] her from physically working." Id. at 263. Freeman never returned to work at North State.

In mid-March 2003, after she had exhausted all of her accumulated leave time, Freeman requested additional leave from the Bank. By letter of March 17, 2003, North State advised Freeman that it would consider her request for additional leave under its Medical Leave Policy. On March 31, 2003, the Bank notified Freeman that it had approved her request for additional leave through April 17, 2003, but that she would be expected to return to work on April 21, 2003. Freeman did not respond to North State's letter, and failed to return to work on April 21, 2003. On April 22, 2003, the

7

Bank notified Freeman in writing that it would treat her failure to return to work, or to communicate her status, as a voluntary resignation.

Shortly after her last day at work, Freeman made a claim for long-term disability benefits ("LTD") with her insurer, Unum Provident ("Unum"). On her claim form to Unum, Freeman indicated that she had been unable to work since January 23, 2003. According to medical records Freeman submitted in support of her LTD claim, the bonus incident caused Freeman significant stress, and Freeman's physician opined that she was "totally and completely unable at this time to perform any type of work, including part-time or sedentary work." J.A 266. On June 17, 2003, Unum notified Freeman that she qualified for LTD benefits. On July 11, 2003, Freeman also applied for disability benefits with the Social Security Administration ("SSA"). She was notified on October 12, 2003, that the SSA found her to be disabled as of January 23, 2003, and eligible for SSA benefits beginning in July 2003.

B.

On May 29, 2003, Freeman filed a discrimination charge against North State concerning her 2002 bonus with the Equal Employment Opportunity Commission (the "EEOC"). On September 15, 2003, the EEOC dismissed Freeman's charge and notified her that, based upon its investigation, there was no evidence to establish any violation of the applicable statutes. Thereafter, on December 9, 2003,

8

Freeman filed a pro se complaint against North State and several members of its Board of Directors in the Eastern District of North Carolina, alleging that she had been the victim of discrimination, based on her age, race, and sex, in the distribution of the 2002 bonuses. After securing counsel, Freeman filed an amended complaint on June 7, 2004, alleging, inter alia, that the Bank had violated Title VII, as well as 42 U.S.C. § 1981, by awarding Freeman, its only African-American LAA, a lower bonus than its two white LAAs, and by terminating Freeman's employment when she complained about the disparity in such bonuses.

On June 28, 2006, after the completion of discovery, North State filed a motion for summary judgment. In relevant part, it maintained that Freeman had not established a prima facie case for discrimination under Title VII and § 1981, and that, even if she had, there was no evidence that North State's explanations for the differences in its 2002 bonuses were pretextual. In response, Freeman maintained that there were genuine issues of material fact on her claims. In an order entered February 21, 2007, the district court granted summary judgment to North State on each of Freeman's claims, explaining that she had failed to establish a prima facie case of race discrimination because receiving a lower discretionary bonus than similarly situated white coworkers does not constitute an adverse employment action. See Freeman v. North State Bank, No. 5:03-cv-916-BO (E.D.N.C. Feb. 21, 2007) (the "Order"). The court

also ruled that, even if Freeman had established a prima facie case, there was no evidence that the explanations given by the Bank for the 2002 bonus disparities were pretextual.  Id. at 4 n.2. Freeman has timely appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

As a general proposition, we review de novo a district court's award of summary judgment, viewing the facts in the light most favorable to the non-moving party.  See Lee v. York County Sch. Div., 484 F.3d 687, 693 (4th Cir. 2007).  An award of summary judgment may be appropriately made only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.  See Fed. R. Civ. P. 56(c).

## III.

On appeal, Freeman contends that the district court erred in awarding summary judgment to North State.  Specifically, Freeman asserts that North State contravened Title VII and § 1981 in four respects:  (1) paying her a lower 2002 bonus, on the basis of race, than it paid to other LAAs; (2) discharging her in retaliation for raising concerns about the disparity in bonuses; (3) constructively

10

discharging her; and (4) acting with racial animus against her throughout her employment. We assess these contentions in turn.

A.

First, Freeman contends that the district court erred in awarding summary judgment to North State on her claim that it had discriminated against her on the basis of race, in contravention of Title VII and § 1981, by awarding her a lower bonus in 2002 than it gave the two white LAAs. Title VII and § 1981 both prohibit discrimination in the workplace on the basis of race. The essential elements of a race discrimination claim are identical under both statutes. See Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004) (explaining that framework for Title VII claims has also been applied to § 1981 claims). To establish a prima facie case, Freeman must provide direct or circumstantial evidence of race discrimination. In this case, Freeman has failed to produce any direct evidence of race discrimination and, thus, we must proceed under what is known as the McDonnell Douglas framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).

Under McDonnell Douglas, a plaintiff is obligated to first establish a prima facie case of discrimination. See Love-Lane, 355 F.3d at 786. If the plaintiff makes such a showing, the defendant must respond with evidence that it acted on a legitimate, non-discriminatory basis. See id. Finally, if the defendant does so, the plaintiff is obliged to present evidence to prove that the

11

defendant's articulated reasons were a pretext for unlawful discrimination. See id. "Although the evidentiary burdens shift back and forth under the McDonnell Douglas framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. (internal quotation marks omitted).

To establish a prima facie case of discrimination, Freeman was obligated to prove that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was performing satisfactorily at the time of the adverse employment action, and (4) similarly situated employees outside the protected class received more favorable treatment. See White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004). In rejecting her claims, the district court concluded that Freeman "has not demonstrated an adverse employment action by receiving a lower bonus than her coworkers, and cannot establish a prima facie case for discrimination." Order 4. The court also ruled that, even assuming Freeman had established a prima facie case, she had not offered sufficient evidence to show that the reasons given by North State for awarding her a lower bonus than the two white LAAs were pretextual. Id. at 4 n.2. Specifically, the court explained that

> [a]ssuming Plaintiff could establish a prima facie case, Defendant offered several non-discriminatory reasons for the difference between Plaintiff's bonus and those awarded to other workers: (1) compensating one woman with a lower base salary who took on additional responsibility; (2) compensating another woman for

12

handling complex loan portfolios and longer work hours; and (3) compensating Plaintiff for supporting one loan officer. Plaintiff has not offered sufficient evidence to show that these reasons are pretext for intentional discrimination.

Id. As a result, the court granted summary judgment to North State on Freeman's race-based claim on her 2002 bonus.

In pursuing her appeal, Freeman asserts that the Bank's reasons were inconsistent, and that such inconsistency is sufficient evidence of pretext. See EEOC v. Sears Roebuck & Co., 243 F.3d 846, 852-53 (4th Cir. 2001) (recognizing that offering "different justifications at different times . . . is, in and of itself, probative of pretext"). She also maintains that her performance was equal to or better than that of the two white LAAs. Contrary to Freeman's contentions, the district court properly ruled that Freeman failed to show that the reasons given by North State for the differences in the 2002 bonuses were pretextual.

Freeman was given an explanation for the differences in the bonuses on several occasions, and although the Bank's explanations may have varied in depth and detail, they were not materially inconsistent. When Freeman first met with Temple and Salisbury, Temple explained that the Bank's 2002 bonuses were based on the number of loan officers each LAA supported. Salisbury added that he thought that the bonuses were discretionary, and Temple responded that "there's more to it than that." J.A. 171. Freeman then met with Temple a second time, and Temple explained that Fly

13

had been given a higher bonus because she had volunteered to support a third loan officer when Freeman supported only one. Finally, counsel for the Bank wrote to Freeman, explaining that the bonuses were completely discretionary, and that the most important factor in the Board's decisions to award the other LAAs higher bonuses was that they supported more loan officers than she did. The letter reasoned that Fly's loan portfolio was more complex than Freeman's, Fly's work was "cleaner," and Fly had volunteered to take on a third loan officer. Id. at 257. As this evidence demonstrates, Freeman was given several consistent explanations for her smaller bonus award.

Freeman also asserts that her performance was equal to or superior to the two white LAAs, and that she can rebut each of the reasons provided by the Bank — and accepted by the district court — to show that it had legitimately awarded her a lower bonus. The first and third reasons identified by the court are intertwined: North State was compensating Fly, who had a lower base salary, for volunteering to take on extra responsibility, and taking into account that Freeman was only supporting one loan officer. Freeman does not contest that Fly supported more loan officers or explain why the Bank could not legitimately take Fly's lower salary into consideration; rather, Freeman contends that she did more work overall than Fly. To support this assertion, Freeman points to several extra duties that she did for the Bank (i.e., attending a

14

seminar, picking up flowers, staffing the Bank's booth at a business expo, and occasionally providing customer support). None of these duties, however, were permanent, day-to-day responsibilities, as opposed to the ongoing duty of supporting a new loan officer. Moreover, it is well-settled that an employer is free to develop its own criteria for employment decisions, so long as those criteria are not race-based. See Beall v. Abbott Labs., 130 F.3d 614, 619 (4th Cir. 1997) ("It is axiomatic that an employer is free to set its own performance standards, provided such standards are not a 'mask' for discrimination." (internal citations omitted)); see also Jiminez v. Mary Washington College, 57 F.3d 369, 383 (4th Cir. 1995) ("The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment."). Consequently, it was permissible for the Bank to premise its bonus decisions on the criteria it deemed pertinent, including the number of loan officers being supported, so long as those criteria were not race-based.[4]

The second basis the district court recognized for the disparity in the 2002 bonuses was that Freeman primarily handled consumer loans, which were less complex, and Kilmer handled the

---

[4]Although Freeman asserts that she did not volunteer to take on the additional loan officer because two of her supervisors advised her that she already had enough work, this contention does not carry the day. Put simply, those individuals did not participate in the 2002 bonus decisions.

15

more complicated commercial loans and worked longer hours. Freeman asserts that this explanation is also pretextual, because the evidence showed that there is little difference between consumer and commercial loans in the work required of the LAAs. Although there may be a factual dispute on whether commercial loans are more complex and thus more time consuming, even if Freeman is correct that commercial loans do not require more work than consumer loans, she still cannot disprove the primary reason the Bank consistently gave for the differences in the 2002 bonuses. That is, Kilmer and Fly both supported more loan officers than Freeman. Thus, this assertion also fails to show that North State's reasons were pretextual.

In explaining a Title VII plaintiff's burden of proof on the issue of pretext, the Supreme Court has recognized that

> an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000). Because the district court properly concluded that there is no issue of material fact on the issue of pretext, Freeman's racial discrimination claim must fail, regardless of whether she can establish a prima facie case of such discrimination. For this

16

reason, we are constrained to affirm the award of summary judgment to North State on this claim.

B.

Second, Freeman maintains that the district court erred in awarding summary judgment to North State on her claim that her employment was terminated in retaliation for her complaints about the disparity in the 2002 bonuses, in contravention of Title VII. To establish a prima facie case for such retaliation, Freeman was required to show that (1) she engaged in a protected activity, (2) the Bank took an adverse employment action against her, and (3) there is a causal connection between the two events.  See EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005).  We agree with the district court that Freeman has failed to establish the third prong of this test:  a causal connection between the protected activity and the adverse employment action.  See Order 5. Put simply, Freeman has failed to establish a causal link between her complaints about the disparity in the bonuses and her subsequent termination.  In fact, when North State terminated her employment, she had exhausted all of her available leave time, plus the extra leave that North State had granted her, and still did not return to work.  As a result, Freeman failed to sufficiently establish a prima facie case for retaliatory discharge, and we affirm the award of summary judgment on this claim as well.

17

Freeman's third claim on appeal is that she presented sufficient evidence of constructive discharge to survive summary judgment. To establish a claim of constructive discharge, Freeman was obligated to show that North State "deliberately made [her] working conditions intolerable, and thereby forced [her] to quit." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 378 (4th Cir. 2004) (internal quotation marks omitted). Mere "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Id. Freeman claims she was constructively discharged twice — first on January 23, 2003, when she left work because she was distraught over being paid a lower bonus than the two white LAAs, and again through North State's "parade of threats, intimidation and coercive tactics in retaliation for making discrimination claims." Br. of Appellant 30. We agree with the district court that Freeman failed to show that North State made her working conditions so intolerable that she was forced to quit her job, see Order 6, and thus affirm the court's award of summary judgment on her constructive discharge claim.

D.

Finally, Freeman claims that North State acted with racial animus towards her throughout her employment with the Bank. In

making this claim, Freeman relies solely on the fact that she was paid a lower bonus in 2001 as well as in 2002. The district court concluded that "[a]lthough the complaint refers to two bonus decisions, [Freeman] has only exhausted her administrative remedies as to one, which is at issue here." Order 2 n.1. Indeed, any individual wishing to challenge an employment practice under Title VII must file a charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). If the employee fails to submit a timely EEOC charge, she may not challenge the alleged unlawful practice in court. See Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. 2162, 2168 (2007) ("A discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present legal consequences." (internal quotation marks omitted)). We agree with the court on this contention as well. Freeman has never filed an EEOC charge regarding her 2001 bonus and, thus, any claims relating to it are barred.

IV.

Pursuant to the foregoing, we reject Freeman's contentions of error and affirm the district court.

AFFIRMED

19