**ON REHEARING**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROBERT L. JORDAN,
              *Plaintiff-Appellant,*

v.

ALTERNATIVE RESOURCES
CORPORATION; INTERNATIONAL
BUSINESS MACHINES CORPORATION,
             *Defendants-Appellees.*

                      No. 05-1485

THE METROPOLITAN WASHINGTON
EMPLOYMENT LAWYERS ASSOCIATION;
PUBLIC JUSTICE CENTER; EQUAL
EMPLOYMENT OPPORTUNITY
COMMISSION,
       *Amici Supporting Appellant.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-04-1091-8-DKC)

Argued: March 14, 2006

Decided: May 12, 2006

Decided on Rehearing: August 14, 2006

Before WIDENER, NIEMEYER, and KING, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the majority opinion, in which Judge Widener joined. Judge King wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Stephen Zak Chertkof, HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN, P.L.L.C., Washington, D.C., for Appellant. Paul D. Ramshaw, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Appellate Services, Washington, D.C., for Equal Employment Opportunity Commission, Amicus Supporting Appellant. William C. Sammons, TYDINGS & ROSENBERG, Baltimore, Maryland, for Appellees. **ON BRIEF:** Douglas B. Huron, Tammany M. Kramer, HELLER, HURON, CHERTKOF, LERNER, SIMON & SALZMAN, P.L.L.C., Washington, D.C., for Appellant. Marc R. Jacobs, SEYFARTH SHAW, L.L.P., Chicago, Illinois, for Appellee Alternative Resources Corporation; J. Hardin Marion, Melvina C. Ford, TYDINGS & ROSENBERG, Baltimore, Maryland, for Appellee International Business Machines Corporation. R. Scott Oswald, EMPLOYMENT LAW GROUP, P.L.L.C., Washington, D.C., for The Metropolitan Washington Employment Lawyers Association and Public Justice Center, Amici Supporting Appellant. Eric S. Dreiband, General Counsel, James L. Lee, Deputy General Counsel, Lorraine C. Davis, Acting Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Equal Employment Opportunity Commission, Amicus Supporting Appellant.

---

**OPINION**

NIEMEYER, Circuit Judge:

When the news broke in October 2002 that police in Montgomery County, Maryland, had captured two black men suspected of being the snipers who had randomly shot 13 individuals, killing 10, in separate incidents over a period of weeks in Maryland, Virginia, and the

District of Columbia, an IBM employee watching the news on television in one of IBM's Montgomery County offices exclaimed, "They should put those two black monkeys in a cage with a bunch of black apes and let the apes f—k them." A fellow employee, Robert Jordan, who is black, was in the room at the time and heard the exclamation. Jordan was offended and discussed the incident with two other co-workers, who told him that the employee had made similar comments before. Jordan then reported the incident to management. A month later Jordan was fired, purportedly because he was "disruptive," his position "had come to an end," and management personnel "don't like you and you don't like them."

Jordan sued IBM and Alternative Resources Corporation ("ARC"), alleging that they jointly were his employer, for retaliation in violation of Title VII of the Civil Rights Act of 1964, and for breach of contract, fraud, and violations of local employment laws. Pursuant to the motion of IBM and ARC, the district court dismissed the complaint by order dated March 30, 2005, under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, and entered judgment on April 26, 2005. The court held that Jordan was not protected by Title VII from his employers' retaliation because no objectively reasonable person could have believed that, in reporting the incident to management, Jordan was opposing an unlawful hostile work environment.

Jordan appealed, and, for the reasons that follow, we affirm.

I

In his complaint, Jordan alleges that in October 2002, he was employed jointly by ARC and IBM in Montgomery County, Maryland, because of the business relationship between the companies. He had entered into an at-will employment relationship with ARC in December 1998 as a network technician and, before October 2002, had been assigned to work at the IBM office in Gaithersburg, Montgomery County, Maryland.

Jordan alleges that, while in the network room at IBM's office on October 23, 2002, he heard his co-worker, Jay Farjah, who was watching television, exclaim — not directly to Jordan but in his pres-

ence — "They should put those two black monkeys in a cage with a bunch of black apes and let the apes f--k them." Farjah was speaking to the television in response to a report that John Allen Muhammad and Lee Boyd Malvo had been captured.*

Over a period of three weeks, Muhammad and Malvo shot 13 people in public places in the greater Washington, D.C. metropolitan area from hidden positions. They killed 10 people and seriously wounded 3. Soon after the snipers' names and a description of their car were released by Montgomery County police late on October 23, Malvo and Muhammad were arrested. Jordan and Farjah were watching this breaking news report on a television at the IBM facility.

In his complaint, Jordan states that he was offended by Farjah's statement and reported it to two IBM supervisors, Mary Ellen Gillard and C.J. Huang, explaining that he believed that Farjah should not utter racist comments in the office. After Gillard spoke with Farjah, who claimed that he only said, "They should put those two monkeys in a cage," Jordan told Gillard he was going to raise his complaint with Ron Thompson, IBM's site manager. Jordan also complained to ARC manager Sheri Mathers.

Jordan alleges that during the month following his complaints about Farjah's inappropriate statement, Gillard delayed Jordan's work shift by two-and-a-half hours and gave him additional work assignments. Jordan also alleges that Huang made a derogatory remark and gestured toward Jordan at an office Thanksgiving party. On November 21, 2002, ARC manager Mathers telephoned Jordan and fired him because, as Jordan alleges, he was "disruptive," his position "had come to an end," and IBM employees and officials "don't like you and you don't like them."

---

*Jordan's complaint alleges that Jordan and Farjah were watching the television report "immediately" after Muhammad and Malvo's capture on "October 23." While Montgomery County police identified Muhammad and Malvo late in the evening of October 23, 2002, the two were not captured until the early morning hours of October 24, 2002. This discrepancy, however, is immaterial, and we assume what has been alleged in the complaint to be true for purposes of reviewing the dismissal order.

Alleging retaliatory discharge in violation of 42 U.S.C. § 2000e-3(a), 42 U.S.C. § 1981, and related state laws, Jordan sued IBM and ARC based on his claim that they fired him for complaining about Farjah's statement. IBM and ARC filed a motion under Federal Rule of Civil Procedure 12(b)(6), alleging that the complaint failed to state a claim upon which relief can be granted. While the defendants' motion to dismiss was pending, Jordan filed a motion for leave to file an amended complaint to add an allegation that after hearing Farjah's remark, he discussed it with several co-workers, and "[a]t least two of the co-workers told Jordan that they had heard Farjah make similar offensive comments many times before." Jordan also proposed to add new state law claims for breach of contract, fraud, and wrongful discharge.

The district court granted the defendants' motion to dismiss, and in doing so not only ruled on the original complaint, but also considered the proposed amended complaint, concluding that it too failed to state a claim upon which relief could be granted. The court held that IBM and ARC could not be liable for retaliation because "Plaintiff has failed to allege that he engaged in a statutorily protected activity." As the court explained, "A plaintiff bringing a claim under the opposition clause of Title VII must at a minimum have held a reasonable good faith belief at the time he opposed an employment practice that the practice was violative of Title VII" (internal quotation marks, alterations, and citation omitted). The court concluded that "Farjah's comment, which [Jordan] does not allege was directed at him, simply is not such a violation." Addressing the proposed amended complaint, the court stated that the additional facts alleged

> still [do] not make "objectively reasonable" Plaintiff's belief that Defendants engaged in unlawful employment practices by allowing an abusive working environment to persist. . . . [N]o facts are alleged to indicate that these prior comments, taken alone or in conjunction with the incident involving Plaintiff, constituted a hostile work environment. Plaintiff's amended complaint does not specify the frequency, severity, or nature of the prior comments, nor even any aspect of their content; it merely states that "two of the co-workers told Jordan that they heard Farjah make similar offensive comments many times before."

From the district court's April 26, 2005 judgment dismissing Jordan's complaint, Jordan filed this appeal.

## II

Our review of an order granting a motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6) is *de novo* and focuses only on the legal sufficiency of the complaint. In conducting this review, we "take the facts in the light most favorable to the plaintiff," but "we need not accept the legal conclusions drawn from the facts," and "we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *see also Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

## III

At the heart of Jordan's complaint is the allegation that IBM and ARC retaliated against him because he complained about Farjah's racist exclamation, made in response to a television report that the two snipers had been captured. Farjah's comment, directed at the news report, was the only time that Jordan had ever heard a racist comment from Farjah. Moreover, Jordan does not complain of any other similar statements made to him by others or heard by him in the workplace. He contends, however, that his complaint about Farjah's comment involved an "incipient violation" of Title VII and therefore is protected by § 704(a) of Title VII, 42 U.S.C. § 2000e-3(a) (prohibiting discrimination when an employee has opposed a practice made unlawful by Title VII). Otherwise, as Jordan argues, "[F]ew workers would accept this early-reporting invitation [to report violations] if they knew they could be fired for their efforts."

IBM and ARC contend that Title VII protects an employee against retaliation for opposing workplace conduct only if the employee had both a subjective belief and an objectively reasonable belief that the employer had engaged in activity that violated the discrimination statutes. The defendants argue that on the facts alleged in this complaint, Jordan's belief could not have been objectively reasonable because "a plethora of authority holds squarely to the contrary . . . [that] a single verbal incident in the workplace, no matter how racially charged, is

[in]sufficient to create a racially hostile work environment." They assert that "because the law on this point is so clear, Jordan [could not] have held an objectively reasonable belief to the contrary."

The relevant provision of Title VII reads:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter.

42 U.S.C. § 2000e-3(a). The plain meaning of the statutory language provides protection of an employee's opposition activity when the employee responds to an actual unlawful employment practice. Reading the language generously to give effect to its purpose, however, we have also held that opposition activity is protected when it responds to an employment practice that the employee *reasonably believes* is unlawful. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406-07 (4th Cir. 2005) (citing *United States ex rel. Wilson v. Graham County Soil & Water Conservation Dist.*, 367 F.3d 245, 255 (4th Cir. 2004), *vacated on other grounds* 125 S. Ct. 2444 (2005); and *Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992)); *see also Peters v. Jenney*, 327 F.3d 307, 320-21 (4th Cir. 2003). Because the analysis for determining whether an employee reasonably believes a practice is unlawful is an objective one, the issue may be resolved as a matter of law. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) (per curiam) (resolving the objective reasonableness of Title VII plaintiff's beliefs through the summary judgment procedure).

The "unlawful employment practices" that an employee can oppose, and thereby be protected from retaliation, include practices that "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Such discrimination includes maintaining a racially hostile work environment, i.e., a "workplace . . . permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67

(1986) (internal quotation marks omitted)). Courts determine "whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23); *see also Breeden*, 532 U.S. at 270 ("[W]orkplace conduct is not measured in isolation"). "A recurring point in these opinions is that simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citations and internal quotation marks omitted).

Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. . . . Such claims are based on the cumulative effect of individual acts"); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

In this case, both Jordan and the defendants agree that Jordan's complaint to IBM and ARC's managers was opposition activity and that the only conceivable unlawful employment practice that Jordan could have been opposing was a hostile work environment. Thus, the question reduces to whether Jordan complained about an actual hostile work environment or, if there was not one, whether Jordan could reasonably have believed there was one.

A

On the question of whether Jordan was complaining of an actual hostile work environment made unlawful by Title VII, we conclude that he was not. While Farjah's comment on October 23, 2002 (or October 24) was unacceptably crude and racist, it was an isolated response directed at the snipers through the television set when Farjah heard the report that they had been arrested. Because the remark was rhetorical insofar as its object was beyond the workplace, it was not

directed at any fellow employee. Moreover, it was a singular and isolated exclamation, having not been repeated to Jordan or in his presence before or after October 23, 2002. Jordan does not and cannot allege in his complaint that Farjah's comment altered the terms and conditions of his employment. Based on all that Jordan knew, Jordan concluded that the remark reflected unacceptable racism and should not have been made. And while we agree with Jordan's sentiment, we conclude that such an allegation is a far cry from alleging an environment of crude and racist conditions so severe or pervasive that they altered the conditions of Jordan's employment with IBM or ARC. The complaint does not describe a workplace permeated by racism, by threats of violence, by improper interference with work, or by conduct resulting in psychological harm. *See Faragher*, 524 U.S. at 787-88.

B

The question of whether Jordan could *reasonably have believed* that he was complaining of a hostile work environment made unlawful by Title VII requires more discussion and must be determined through an objective-reasonableness inquiry, as exemplified by our decision in *EEOC v. Navy Federal Credit Union*, 424 F.3d 397 (4th Cir. 2005).

In *Navy Federal*, management had concocted a secret and elaborate scheme to create an unfavorable personnel record and then, based on the fabricated record, fire a black female employee in retaliation for her internal complaints about race, sex, and age discrimination. The employee's supervisor refused to participate in the plan. When the supervisor's employment was terminated because the supervisor resisted management's plan, the EEOC sued Navy Federal for retaliation. We held that the supervisor's resistance and refusals were opposition activity protected by § 2000e-3(a) even though Navy Federal's management had not yet accomplished its discriminatory scheme by firing the black female employee. Thus, even though Navy Federal probably was not yet liable for actually discriminating against the black female employee, we held that the supervisor nonetheless held "a reasonable belief that Navy Federal was unlawfully retaliating" against the employee because management "[had] *set in motion a plan* to terminate [the black female employee] in retaliation for her

complaints of racial discrimination, while at the same time seeking to conceal their improper motives." *Navy Federal*, 424 F.3d at 407 (emphasis added). Stated otherwise, because there was no question that Navy Federal's plan, if accomplished, would have resulted in a Title VII violation and management had unmistakably begun to implement the plan, we held that the supervisor could reasonably have believed that she was opposing an employment action made unlawful by Title VII. Indeed, but for the supervisor's opposition, Navy Federal's management would have succeeded in their attempted unlawful discrimination.

In this case, Jordan argues that he had an objectively reasonable belief that Title VII was about to be violated because "had [Farjah] continued, unabated, his conduct would at some point have ripened into [a] racially hostile work environment." While in the abstract, continued repetition of racial comments of the kind Farjah made might have led to a hostile work environment, no allegation in the complaint suggests that a plan was in motion to create such an environment, let alone that such an environment was even likely to occur. *Navy Federal* holds that an employee seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress. Under § 2000e-3(a) as construed by *Navy Federal*, we cannot simply *assume*, without more, that the opposed conduct will continue or will be repeated unabated; rather, the employee must have an objectively reasonable belief that a violation is actually occurring based on circumstances that the employee observes and reasonably believes.

When considering the facts alleged by Jordan in his complaint, no objectively reasonable person could have believed that IBM's Montgomery County office was in the grips of a hostile work environment or that one was taking shape. That is, no objectively reasonable person could have believed that the IBM office was, or was soon going to be, infected by severe or pervasive racist, threatening, or humiliating harassment. Jordan had been employed at the location for four years and had not complained of any racist or abusive incidents. On the day in question, Jordan overheard Farjah speak a single abhorrent slur prompted by — though not excused by — a breaking news report. As Jordan acknowledges in his complaint, Farjah was in Jordan's presence at the time, but he was not talking directly to Jordan

or to any employee. Although Jordan could reasonably have concluded that only a racist would resort to such crudity even in times when emotions run high, the mere fact that one's *coworker* has revealed himself to be racist is not enough to support an objectively reasonable conclusion that the *workplace* has likewise become racist.

Jordan's proposed amended complaint added allegations that, after hearing Farjah's comment, Jordan spoke to several co-workers and two of them referred to some similar statements made by Farjah in the past. But Jordan never experienced them, nor did he witness a workplace affected by them. From his coworkers' vague references, Jordan did not know about where or when such statements were made, or what Farjah said except that the statements were similar. There is, moreover, no allegation that any of those earlier statements interfered with Jordan's or any other employee's work performance, were complained about, or gave rise to a hostile environment at Jordan's workplace. Although these observations tended to confirm that Farjah makes racist comments, no allegation reasonably supports the inference that they were likely to recur at a level sufficient to create a hostile work environment. Jordan rests his case on the assumption that Farjah would repeat the remarks that he made on October 23 more frequently than his past history indicates; Jordan makes no allegations justifying this assumption.

Arguing for a rule that would protect virtually any complaint about a racist remark, Jordan maintains that, as a policy matter, "it is imperative that employees report harassment early" and that, in this case, he "was acting to prevent a hostile environment from arising." He argues that the *Navy Federal* reasonableness requirement stands in tension with the early reporting policy incentives discussed in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764 (1998), and *Faragher*, 524 U.S. at 806, especially because we have held that employers are not liable for an employee's unlawful harassment of another employee if the harassed employee has unreasonably refused to report or has unreasonably waited many months before reporting a case of actual discrimination. *See Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267-68 (4th Cir. 2001); *see also Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 269-70 (4th Cir. 2001) (holding that an employee need not forestall reporting a workplace harasser in order to "collect evidence" against him so long as the conduct was

actionable, i.e., that it was unwelcome, based on the employee's gender, "*and sufficiently pervasive or severe to alter the conditions of employment*") (emphasis added)). Employees, Jordan argues, are left in "a double-bind — risking firing by reporting harassing conduct early, or waiting to report upon pain of having an otherwise valid claim dismissed."

Jordan's dilemma, that the law is inconsistent by both encouraging and discouraging "early" reporting, is presented too abstractly. The strong policy of removing and preventing workplace discrimination can and does coexist with *Navy Federal*'s objective reasonableness standard — a standard that pervades Title VII jurisprudence. *See Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006). If Jordan were right, our opinion in *Navy Federal* would have been considerably shorter. We would not have provided an analysis of the reporting employee's reasonable belief in the existence of a Title VII violation. Rather, we would have concluded more simply that, by reporting on her supervisor's uncompleted yet abstractly illegal scheme, the *Navy Federal* plaintiff was protected by the policy favoring early reporting. *Navy Federal* recognized, however, that despite this policy, Congress did not write the antiretaliation provision in Title VII to protect employees who, with no more than good faith, complain about conduct that no reasonable person would believe amounts to an unlawful employment practice.

Jordan overlooks the fact, which is fundamental to Title VII jurisprudence, that there is a difference between an isolated racial slur, which is always and everywhere inappropriate, and the sort of severe or pervasive conduct that creates a hostile work environment. "Title VII does not prohibit all verbal or physical harassment in the workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998); *see also id.* (reasoning that Title VII will not become "a general civility code for the American workplace" so long as courts pay "careful attention to the requirements of the statute"). Although the distinction between a racial slur and a hostile workplace may at a highly abstract level seem a difficult one for employees to manage, the distinction should not be conceived of in the abstract but rather in light of the *Navy Federal* objective reasonableness standard, which serves to protect an employee's judgment in a close case. Objectively reasonable employees can and do recognize that not every offensive

comment will by itself transform a workplace into an abusive one. Therefore it sometimes will not be reasonable for an employee to believe that the isolated harassing event he has witnessed is a component of a hostile workplace that is permeated with discriminatory intimidation, ridicule, and insult.

Moreover, Jordan's dilemma is at its core a false dilemma, comparing the qualitative requirement of objective reasonableness in reporting with the laches concept espoused in *Faragher* and developed in *Matvia*. *See Faragher*, 524 U.S. at 807 (holding that an employee cannot "*unreasonably* fail[ ] to take advantage of any preventive or corrective opportunities" (emphasis added)); *Matvia*, 259 F.3d at 270 (holding that an employee who waited nearly three months after the first actionable incident of sexual harassment waited too long). When he argues that he risks being fired by reporting *too early*, he refers to reporting when there is *insufficient conduct* about which to complain; but when he argues that he risks dismissal of his claim by reporting *too late*, he refers to the inordinate *time delay* as described in *Matvia*. The concepts are not comparable and create no dilemma.

The time constraint of *Matvia*, moreover, is of limited applicability in any comparison because it only prevents an employee who waited unreasonably long to take advantage of an employer's antiharassment policy from overcoming the employer's affirmative defense based on the existence of that policy under *Ellerth* and *Faragher*. But the employee can belatedly report discriminatory conduct and still be protected from retaliation. The employee enjoys that immunity so long as he reports an unlawful employment practice or an employment practice that an objectively reasonable employee would believe is unlawful. Thus, an employee who unreasonably delays acting on his discrimination claim and thereby loses his right to a judicial remedy under *Matvia* still has the incentive to report the unlawful conduct, under the protection of the antiretaliation statute, because of the increased likelihood that his employer will remedy the conduct extrajudicially in order to maintain the effectiveness of its antidiscrimination policy.

As the law stands, employees are not subject to conflicting incentives. Complaining employees are protected by Title VII once they have an objectively reasonable belief that a Title VII violation has

occurred, and they have a reasonable amount of time in which to bring their concern to their employers' attention if they want to protect their right to sue their employers. Only at an impermissibly high level of generality, where meaningful distinctions can no longer be observed, can it be argued that the law inconsistently encourages employees to report and at the same time not to report violations, and Jordan's argument, if accepted, would lead to the adoption of a new rule that protects employees who have no reasonable belief that a Title VII violation has occurred, contrary to the statutory limits of the law. When considered in actual application, the objective reasonableness standard *protects* the reporting employee.

Jordan's argument that the *Navy Federal* rule creates a perverse incentive for employers to "fire workers quickly before they have [Title VII] claims" is hyperbolic. Employers who trap employees by firing those who use their antiharassment reporting procedures could very well lose their affirmative defense in cases where employees do not report suspected violations, for this circuit requires that employers prove, by a preponderance of the evidence, that their antiharassment policies are "effectively enforced" before they may use such policies to defeat discrimination claims. *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 299 (4th Cir. 2004).

Congress limited the scope of retaliation claims, and *Navy Federal* amply, indeed generously, protects employees who reasonably err in understanding those limits. We are unwilling to extend *Navy Federal* and establish a rule tantamount to a statutory civility code. Accordingly, we affirm the district court's conclusion that Jordan's complaint in this case, as well as his proposed amended complaint, fails to state a claim upon which relief can be granted.

IV

The remaining counts of Jordan's complaint, which are grounded essentially on the same core allegations that support his Title VII claim, fail to state claims upon which relief can be granted for reasons similar to or deriving from those supporting dismissal of his Title VII claim.

With respect to his claims for unlawful retaliation under 42 U.S.C. § 1981 and Montgomery County Code § 27-19(c)(1), Jordan

acknowledges that the applicable principles are the same as those for determining liability under Title VII. *See Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) (with respect to § 1981); *Magee v. DanSources Technical Servs., Inc.*, 769 A.2d 231, 252-53 (Md. Ct. Spec. App. 2001) (with respect to the Montgomery County Code). Because there is no actionable Title VII retaliation alleged, these claims based on the same analysis must also fail.

V

Jordan also contends that the district court erred in dismissing his discrimination claim under 42 U.S.C. § 1981 — as distinct from his retaliation claim — for failing to state a claim upon which relief can be granted. Citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), he argues that under notice pleading he may state a claim upon which relief can be granted by relying on his complaint, which alleges 24 paragraphs of facts and concludes with the allegation that "his race was a motivating factor" in being fired. Because the concluding allegation is supported by neither the alleged facts nor the fair inferences to be drawn from them, the defendants contend that it is no more than a conclusory allegation that "does not satisfy *any* pleading standard." Jordan responds that he does not rely on the single allegation that his race was a motivating factor and that the single allegation should not be read in isolation. The count alleging a § 1981 discrimination claim, he states, "incorporates all prior factual allegations detailed in the complaint," and the final conclusory allegation follows from the facts alleged. He maintains that his complaint is significantly more detailed than that upheld in *Swierkiewicz.*

In alleging his § 1981 discrimination claim, which is Count VII of his complaint, Jordan did incorporate by reference paragraphs 1-24 of the complaint, and thus, as he claims, these paragraphs constitute the facts of Count VII. The 24 paragraphs, which constitute the only factual allegations of the complaint, begin with the summary that the defendants fired Jordan "because he complained about conduct that he reasonably believed constituted a hostile work environment or would, if unabated, constitute such an environment." After alleging jurisdiction and describing the parties, he sets forth the specific events that formed the grounds of his complaint. First, he describes the event on October 23, 2002, when Farjah made the racist remark while he and

Farjah were standing in IBM's network room watching a television report about the capture of Malvo and Muhammad. He alleges also that on that same day he reported the remark to coworkers and to three different managers. He related how one of the managers reported back that Farjah denied making the remark in the form alleged by Jordan. Jordan thereafter reported the remark to another manager. Finally Jordan alleges that the defendants retaliated against him for reporting the remark, first by changing his schedule and his job assignments and then, about a month later, by firing him. The complaint alleges that when Jordan was notified about being fired, the defendants gave as their reasons that Jordan was "disruptive," his position "had come to an end," and that "IBM 'don't like you and you don't like them.'" Jordan alleges that these reasons were a pretext and that the real reason for which he was fired was "his opposition to Farjah's racially offensive statement."

After setting forth these facts and incorporating them into Count VII, the complaint concludes with the allegation that "Jordan's race was a motivating factor in the conduct and decisions of IBM and/or ARC."

In evaluating Count VII on the defendants' motion to dismiss under Rule 12(b)(6), the district court read it as alleging that Jordan was fired for reporting a racist remark but as failing to demonstrate any basis from which to conclude that his own race "played any role in his termination." The court observed that the only person alleged to have engaged in racist conduct was Farjah, and "Farjah [was] not alleged to have contributed to Jordan's termination." The court concluded:

> His § 1981 claim is therefore insufficient as a matter of law. Although no facts alleged thus far have indicated that Defendants discriminated against Plaintiff because of his race, the court will permit Plaintiff to amend this count to allege any such facts.

Jordan elected to rest on his complaint as written, advising the district court that he would not avail himself of the opportunity to amend and requesting the court to enter a final judgment on his § 1981 discrimination count.

Only now, for the first time in his reply brief on appeal, does Jordan provide a theory of how his complaint purports to state a claim of racial discrimination under § 1981. He states:

> The facts in this case raise a strong inference of retaliation, but they also raise an inference of discrimination based on race. When appellees learned that an IBM employee, Jay Farjah, made a crude racist remark to Robert Jordan, they took no action against Farjah and instead fired Jordan, an African-American employee who asked them to stop the offensive behavior. This raises an inference that the relevant managers tolerated racist comments, or even condoned them. And since Farjah had made similar comments many times before, a jury could infer that this conduct was nothing new for the managers. Tolerating or condoning racist comments in the workplace is itself evidence of racial bias, . . . and evidence of bias, along with the unexplained firing of a good employee, is a sufficient factual basis for a jury to conclude that Jordan was treated more harshly in his situation than he would have been if he were white.

For a § 1981 discrimination claim, Jordan must allege that he is a member of a racial minority; that the defendants' termination of his employment was *because of his race*; and that their discrimination was intentional. *See Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993). In his complaint, however, Jordan has not demonstrated how Farjah's racism could be imputed to the defendants on a basis by which relief under § 1981 could be afforded. Instead of amending his complaint to state a viable claim, Jordan simply rested on his illogical conclusory statement that his race was a "motivating factor" for his firing, without explaining how that conclusion is consistent with the allegations that he has made. In just such circumstances, we have rejected reliance on similar conclusory allegations, particularly when the plaintiff, like Jordan, has purported to set forth in detail the facts upon which his claims are based. *See Bass*, 324 F.3d at 765 (holding that conclusory allegations that the employer discriminated against the plaintiff "because of her race and sex" were not sufficient to allege a claim when the facts of the complaint did not support the conclusory allegation); *see also Eastern Shore Mkts.*, 213

F.3d at 180 (in reviewing a Rule 12(b)(6) motion, "[w]e need not accept the legal conclusions drawn from the facts").

Jordan first defends his purported allegation of a § 1981 discrimination claim by contending that it conforms to the lenient standards of notice pleading permitted by the rules and affirmed in *Swierkiewicz*. But the district court's dismissal order was not premised on Jordan's failure to give notice of his claim to the parties. Rather, it concluded that what was alleged failed to state a discrimination claim under § 1981 upon which relief can be granted. Even with notice pleading, a complaint purporting to describe the events justifying relief must nonetheless demonstrate that relief can be granted in those circumstances.

Rule 8(a) of the Federal Rules of Civil Procedure provides that a complaint filed in federal court must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). And Rule 12(b)(6) authorizes dismissal of a complaint that "fails to state a claim upon which relief can be granted." The holding in *Swierkiewicz* does not eliminate the need to comply with these rules. In *Swierkiewicz* the Supreme Court held that the Second Circuit's "heightened pleading standard," requiring a civil rights plaintiff to plead facts that constitute a *prima facie* case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), demanded too much of the pleader. The Court observed that the plaintiff's case might not even depend on a demonstration of the *prima facie* case under *McDonnell Douglas*. As the Court stated:

> [U]nder a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a *prima facie* case because the *McDonnell Douglas* framework does not apply in every employment discrimination case. For instance, if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a *prima facie* case.
>
> \*     \*     \*
>
> It thus seems incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may

ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered.

534 U.S. at 511-12. But that holding, which recognizes that the *prima facie* case is a standard of proof distinct from the essential elements of a cause of action, left untouched "the burden of a plaintiff to allege facts sufficient to state all the *elements* of her claim." *Bass*, 324 F.3d at 765 (emphasis added); *see also Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) ("[T]he Supreme Court's holding in *Swierkiewicz v. Sorema* did not alter the basic pleading requirement that a plaintiff set forth facts sufficient to allege each element of his claim" (internal citation omitted)).

Consequently, when a plaintiff's complaint sets forth facts in support of his claim for relief and tracks the language of the applicable cause of action, the legal conclusions "are not talismanic" because "it is the alleged facts supporting those words, construed liberally, which are the proper focus at the motion to dismiss stage." *Bass*, 324 F.3d at 765. In *Bass*, the plaintiff pleaded that her employer discriminated against her "because of her race and sex." *Id.* (quoting the plaintiff's complaint). Yet she supported this allegation with "a story of a workplace dispute regarding her reassignment and some callous behavior by her superiors," which did "not seem to have anything to do with gender, race, or age harassment." *Id.* Construing the *Bass* plaintiff's complaint in her favor, we were unable to determine how her story involved any discrimination "because of her race and sex."

Jordan's count for a § 1981 discrimination claim is similarly deficient. The count conclusorily states that the defendants violated § 1981 because race was a motivating factor in his termination. Yet the 24 paragraphs of facts that are made part of that count provide no support for the violation, just as was the case in *Bass*. Like the district court, we cannot discern in his claim any way that Jordan's race factored into his termination.

To salvage his claim, Jordan argues for the first time on appeal that "inferences" may be drawn from his complaint to support a § 1981 discrimination claim. He states (1) that his managers must be racist because they did not fire the racist but did fire him, and (2) that in fir-

ing him, his managers treated him more harshly than they did white employees.

These matters, however, are not alleged in the complaint, and they cannot now be taken as amendments to the complaint. Indeed, the district court gave Jordan ample leeway and opportunity to amend his complaint, an opportunity that Jordan refused.

Moreover, these new allegations are not fair inferences inasmuch as they are mere speculation and argument. It does not follow that a manager who does not fire an alleged racist is therefore himself a racist, and it does not follow that a racist who fires an employee did so because of his racism. There is also no basis in the complaint to conclude that Jordan, as a complaining black employee, was treated differently from a white complaining employee. Indeed, there is no suggestion that any employee other than Jordan complained to management about a racist comment.

Jordan's "inferences" thus are simply unwarranted inferences that do not provide support for a statement of claim. *See Eastern Shore Mkts.*, 213 F.3d at 180.

Accordingly, we affirm the district court's order dismissing Jordan's discrimination claim under 42 U.S.C. § 1981.

## VI

Jordan also claims that "IBM's conduct constituted other unlawful behavior" as described in Montgomery County Code §§ 27 19(c)(2)-(c)(4). Section 27-19(c)(2) prohibits assisting in, compelling, or coercing discriminatory practices prohibited by the Code. The only discriminatory practice prohibited by the Code that Jordan alleges is § 27-19(c)(1) retaliation, but because he has not stated a claim for which relief can be granted under that provision, he cannot state an assistance claim under § 27-19(c)(2). The same reasoning compels the dismissal of Jordan's § 27-19(c)(3) claim, for obstructing or preventing enforcement of the Code, and § 27-19(c)(4) claim, for attempting discriminatory practices prohibited by the Code.

## VII

Jordan also purports to assert claims for fraudulent inducement or breach of contract. He alleges that IBM and ARC, by promulgating anti-harassment policies outlining steps for alerting supervisors to workplace harassment, encouraged him to report Farjah's comment and then fired him for doing so.

In Maryland, a fraud claim must allege that a misrepresentation was made for the purpose of defrauding the plaintiff and that the misrepresentation's falsity was known to the defendant. *See Gross v. Sussez, Inc.*, 630 A.2d 1156, 1161 (Md. 1993). But Jordan fails to allege that the defendants, in creating and distributing their policies, acted with a purpose to defraud and with the knowledge that representations made by them were false. The fraud claim must fail for lack of those essential elements.

Jordan's claim for breach of contract must fail because IBM's and ARC's anti-discrimination policies were not enforceable contracts. While Jordan concedes this fact, he argues that we should apply promissory estoppel to "prevent injustice." Maryland courts, which disapprove of the term "promissory estoppel," have incorporated the *Restatement (Second) on Contracts* to adopt the analogous doctrine of "detrimental reliance," a tort that does not sound in fraud. *See Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996); *id.* at 533 n.29. To show detrimental reliance on a promise, Jordan must allege a clear and definite promise. But the policies of both IBM and ARC *expressly disclaim* creating enforceable obligations. Moreover, the policies do not clearly promise that employees will not be discharged if they report conduct they believe to be harassment.

## VIII

Jordan also claims that IBM tortiously interfered with his ARC employment contract, pleading this claim in the alternative on the assumption that IBM was not his joint employer. In response to the district court's dismissal of this claim because Jordan was an at-will employee, Jordan now argues that his ARC employment was contractual "in nature," albeit not a contract for a fixed term and thus terminable at will.

In *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 113 (Md. 1994), the Maryland Court of Appeals noted the existence of a "broader right" that entitles a plaintiff to sue even when "no contract or a contract terminable at will is involved" — the right to be protected from interference with economic relations. Thus, Jordan's tortious interference claim must be analyzed as a claim for interference with economic relations. *See Alexander & Alexander, Inc. v. B. Dickson Evander & Assocs.*, 650 A.2d 260, 268 n.13 (Md. 1994) ("Interference with a contract terminable at will is analyzed as interference with economic relations broadly, and not interference with a specific contract"). Interference with economic relations requires showing tortious intent and wrongful or improper conduct. *Macklin*, 639 A.2d at 119. In *Alexander & Alexander*, the Court of Appeals held that "wrongful or malicious interference with economic relations is interference by *conduct that is independently wrongful or unlawful*" and went on to identify such conduct as "violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." 650 A.2d at 271 (emphasis added) (internal quotation marks omitted).

Jordan has not alleged any conduct that is independently unlawful and accordingly fails to state a claim upon which relief can be granted.

IX

Finally, Jordan alleges that he was wrongfully discharged.

Although the Maryland Court of Appeals acknowledges the general rule that an at-will employee can be fired at any time, it has also created an exception that an employer cannot fire an at will employee for a reason that violates a statute or public policy. *See Adler v. Am. Standard Corp.*, 432 A.2d 464 (Md. 1981). In *Adler*, the court specifically held that the complaint must allege that the employee's discharge "contravened some clear mandate of public policy." *Id.* at 473. But such a claim may not become a substitute for violations of public policy for which a statute provides its own remedies. *See Makovi v. Sherwin-Williams Co.*, 561 A.2d 179 (Md. 1989).

While Jordan alleges that his discharge violates "Maryland public policy[, which] prohibits employers from punishing employees who report racially offensive behavior that they believe in good faith violates anti-discrimination laws," Maryland already provides statutory remedies for employees alleging retaliation, and those laws' objective criteria indicate that there is no public policy to protect employees simply for subjectively acting in good faith. The district court properly dismissed this claim also.

*     *     *

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

KING, Circuit Judge, dissenting:

My colleagues of the panel majority have today concluded that, as a matter of law, it was not reasonable for an African-American employee to think that the on-the-job remark made by his IBM co-worker — "[t]hey should put those two black monkeys in a cage with a bunch of black apes and let the apes fuck them" — warranted being reported to his employers as a potential Title VII violation. And, in the majority's view, Plaintiff Robert Jordan has not sufficiently alleged that IBM's decision to fire him for making that report was racially motivated. I disagree and write separately to elaborate on my position. First, in ruling that Jordan has not stated a Title VII retaliation claim, the majority has misconstrued the facts and misapplied the law, placing employees who experience racially discriminatory conduct in a classic "Catch-22" situation. Second, its conclusion that Jordan has not stated a claim of a racially discriminatory discharge is contrary to controlling Supreme Court precedent.[1]

_____

[1]By order of July 5, 2006, we unanimously granted panel rehearing, thereby vacating the panel majority's earlier decision, which had affirmed the district court's dismissal order, *see Jordan v. Alternative Res. Corp.*, 447 F.3d 324 (4th Cir. 2006), and from which I had dissented, *see id.* at 336 (King, J., dissenting). By its decision today, the majority has again affirmed the district court's dismissal order. In so

I.

This proceeding is on appeal after having been dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. In reviewing such a ruling, we are obliged to accept the facts alleged by Jordan as true, and review those allegations in the light most favorable to him. *See Lambeth v. Bd. of Comm'rs*, 407 F.3d 266, 268 (4th Cir. 2005). A proper application of these principles undermines the majority's decision in this case.

In October 2002, Jordan, an employee of IBM and ARC since December 1998, was standing near his IBM co-worker, Jay Farjah, in a television room at their IBM worksite in Maryland. Amend. Compl. ¶ 9.[2] They were watching reports on the capture of two snipers (both African-American) who had terrorized the Washington, D.C. area that fall. *Id.* As they watched, Farjah loudly stated his position that "[t]hey should put those two black monkeys in a cage with a bunch of black apes and let the apes fuck them" (the "'black monkeys' comment"). *Id.* Immediately after Farjah made the "black monkeys" comment, Jordan reported it to other co-workers. *Id.* ¶ 10. Two of those co-workers related to Jordan that "they had heard Farjah make similar offensive comments many times before." *Id.* Armed with this knowledge, and pursuant to IBM's policy that its employees were obliged to report racially discriminatory conduct to management, Jordan advised C. J. Huang and Mary Ellen Gillard, two of his IBM manag-

doing, it has rewritten its earlier opinion to reduce the importance of the snipers' capture in its discussion of Jordan's Title VII claim (although the capture remains prominent in the majority's analysis of that claim), and in an endeavor to further explain its decision concerning Jordan's § 1981 discrimination claim, which had previously been relegated to two conclusory sentences, *see id.* at 334 (majority opinion). In these circumstances, I am disappointed that our panel rehearing has merely prolonged the decisional process, without altering the result reached.

[2]The district court denied as futile Jordan's motion to amend. In so ruling, however, the court considered the allegations of the Amended Complaint together with those of the Complaint. At oral argument, IBM conceded that the Amended Complaint's allegations are before us in this appeal.

ers, of the "black monkeys" comment. *Id.* at ¶¶ 11-12. When Jordan requested that the IBM managers speak with Farjah and tell him "not to make such comments," the IBM managers directed Jordan to put the "black monkeys" comment in writing (and he obliged). *Id.* at ¶ 12. Huang then asked Jordan if he had considered the impact that his complaint might have on Farjah, and suggested that "Farjah may have been joking." *Id.* at ¶ 13.

Thereafter, Ms. Gillard reported to Jordan that Farjah admitted to having said "they should put those two monkeys in a cage," but that he denied having made the balance of his "black monkeys" comment. Amend. Compl. ¶ 15. Jordan then advised Gillard that he wanted to bring his complaint to the attention of Ron Thompson, IBM's site manager. *Id.* Jordan also discussed the comment with Sheri Mathers, an ARC manager. *Id.* at ¶ 14.

Jordan's working conditions took a downward turn immediately after he reported Farjah's "black monkeys" comment to IBM management. Amend. Compl. ¶ 16. Prior to reporting the comment, Jordan had been authorized to start his work day at 6:30 a.m., which permitted him to pick up his son after school. *Id.* Without notice or explanation, Gillard changed Jordan's work schedule, requiring him to report to work at 9:00 a.m. each day, thereby precluding him from picking up his son from school. *Id.* Jordan also received a sudden increase in his workload. *Id.* at ¶ 17. And at the office Thanksgiving party, "Huang made a crude, derogatory remark and gesture to Jordan." *Id.* Then, on November 21, 2002 — about a month after he first complained to IBM's managers of Farjah's "black monkeys" comment — Jordan was fired from his job, at IBM's request. *Id.* at ¶ 19. According to the allegations, IBM had Jordan fired "because of his opposition to Farjah's racially offensive statement." *Id.* at ¶ 20. Furthermore, IBM's decision to retaliate against Jordan was made "because he is African-American," and his "race was a motivating factor." *Id.* at ¶ 42.

## II.

To begin with, the severity of Farjah's racially hostile "black monkeys" comment merits our consideration. It is plain that a reference to our African-American fellow citizens as "monkeys" reflects the

speaker's deep hostility towards them — on the sole basis of their color. And it is equally clear that such comments constitute profound insults to our friends in the African-American community. By referring to African-Americans as "monkeys," the speaker plays on historic, bigoted stereotypes that have characterized them as uncivilized, non-human creatures who are intellectually and culturally inferior to whites. *See, e.g.*, Jennifer M. Russell, *On Being a Gorilla in Your Midst, or, the Life of One Blackwoman in the Legal Academy*, 28 Harv. C.R.-C.L. L. Rev. 259, 260 (1993) (discussing message conveyed by gorilla picture placed anonymously in mailbox of African-American law professor: "'Claim no membership to the human race. You are not even a sub-species. You are of a different species altogether. A brute. Animal, not human.'").[3] Indeed, our Court probably understated the impact of such racially charged references in recently observing that "'[t]o suggest that a human being's physical appearance is essentially a caricature of a jungle beast goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.'" *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 298 (4th Cir. 2004) (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)).

In his "black monkeys" comment, Farjah openly opined that the "black monkeys" should be put in a "cage with a bunch of black apes" so that the "apes" could "fuck them." While we must endeavor to do so, our panel is scarcely qualified to comprehend the impact such a remark would have on the reasonable African-American listener. Suffice it to say that, in a single breath, Farjah equated African-

---

[3]Professor D. Marvin Jones, who has researched and written extensively on the subject, has observed that:

> The Europeans . . . equated "the unknown" with the uncivilized, and uncivilized men with animals. Hence, it is not surprising that the early Roman historian Herodotus reported that Africa was filled with "dog eared men, and the headless that have eyes in their chests." The historical record is replete with examples of Europeans attributing animal characteristics to blacks, culminating in controversial conjecture originating in . . . seventeenth[-]century England that blacks had sprung from apes.

*See* D. Marvin Jones, *Darkness Made Visible: Law, Metaphor, and the Racial Self*, 82 Geo. L.J. 437, 466 (1993).

Americans with "black monkeys" and "black apes," and implied a savage, bestial sexual predilection acutely insulting to members of the African-American community.

### III.

In this case, Jordan contends, inter alia, that IBM and ARC fired him for reporting Farjah's "black monkeys" comment to IBM's managers, and that his firing contravened Title VII of the Civil Rights Act of 1964 (codified at 42 U.S.C. §§ 2000e to 2000e-17). The district court ruled that his Complaint and Amended Complaint each failed to state a claim of Title VII retaliation. On appeal, the primary issue we face is whether Jordan has alleged facts sufficient to show that, in reporting the "black monkeys" comment to IBM management, he was engaged in a Title VII protected activity.

Jordan maintains that, in reporting the "black monkeys" comment to IBM and ARC, he was reasonably opposing a potential racially hostile work environment. Title VII has been consistently interpreted as prohibiting conduct that is "so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (internal quotation marks and alteration omitted). A hostile work environment is unique among the employment practices that contravene Title VII, in that such an environment normally develops through a series of separate acts, which might not, standing alone, violate Title VII. Indeed, such an environment is usually the sum of several parts. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). And whether a hostile work environment exists in fact can be a bit of a moving target; there is no "mathematically precise test." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

An employee who opposes a hostile work environment is engaged in a "protected activity" and cannot be retaliated against. *See* Title VII § 704(a), 42 U.S.C. § 2000e-3(a).[4] The Supreme Court emphasized in

---

[4]In relevant part, Title VII, at 42 U.S.C. § 2000e-3(a), prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter."

June of this year that "Title VII depends for its enforcement upon the cooperation of employees," and that "effective enforcement [of Title VII] could thus only be expected if employees felt free to approach officials with their grievances." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. ___, 126 S. Ct. 2405, 2414 (2006)(internal quotation marks omitted). According to the Court, "[i]nterpreting the anti-retaliation provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of [Title VII's] primary objective" — preventing harm — "depends." *Id.*

And we have recognized that a plaintiff pursuing a Title VII retaliation claim need not show that the activity he opposed has, in fact, contravened some aspect of Title VII. Rather, he must simply have a reasonable belief that Title VII has been — or is in the process of being — violated by the activity being opposed. *See EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406-07 (4th Cir. 2005); *see also Peters v. Jenney*, 327 F.3d 307, 320 (4th Cir. 2003) (concluding, in reliance on decisions under Title VII, that "to show 'protected activity,' the plaintiff in a Title VI retaliation case need only prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring" (internal quotation marks and alteration omitted)). Accordingly, we are obliged to vacate the district court's ruling if Jordan was engaged in a protected activity when he complained to IBM, i.e., if he reasonably believed that Title VII was being contravened when Farjah made his "black monkeys" comment.

In the majority's view, Jordan is not protected by Title VII, and IBM and ARC were thus free to fire him for reporting Farjah's "black monkeys" comment. The majority's conclusion on this point, however, relies on its misapprehension of Jordan's allegations and its misapplication of the controlling legal principles. As a result, its decision has placed employees like Jordan in an untenable position, requiring them to report racially hostile conduct, but leaving them entirely at the employer's mercy when they do so.

A.

The majority maintains that no reasonable person could believe that Farjah's racially charged conduct would continue, because it was

"a single abhorrent slur prompted by — though not excused by — a breaking news report." *See ante* at 10. On this basis, it concludes that "Jordan rests his case on the assumption that Farjah would repeat the remarks that he made on October 23 more frequently than his past history indicates." *Id.* at 11. The majority's position, however, cannot be reconciled with the allegations of the Amended Complaint.

Our inquiry must focus on Jordan, and whether it was reasonable for him to believe that Title VII was in the process of being violated when Farjah's "black monkeys" comment was made. *See Navy Fed.*, 424 F.3d at 406-07; *Peters*, 327 F.3d at 320. Even if the "black monkeys" comment was prompted by a news report and not specifically aimed at Jordan or anyone else in the room, a reasonable person could readily conclude that, if not confronted, Farjah's conduct would continue unabated, altering the working conditions of IBM's African-American employees. Indeed, Farjah apparently offered no apology or explanation (such as that supplied today by the majority) to manifest any remorse or regret for having made his "black monkeys" comment. Responding to such blatant and unabashed racism in his workplace, Jordan "immediately reported [Farjah's] remark to several co-workers," and at least two of them advised Jordan "that they had heard Farjah make *similar offensive comments many times before*." Amend. Compl. ¶ 10 (emphasis added). That information confirmed Jordan's initial concerns, thereby providing substantial (and ample) support for his reasonable conclusion that African-American workers at IBM's facility were regularly exposed to conduct akin to the "black monkeys" comment, and that such conduct would continue unless Farjah was confronted.

In the majority's view, the information provided by Jordan's co-workers, coupled with the "black monkeys" comment, did not allow Jordan to reasonably believe that Farjah's conduct would be repeated. As the majority sees it, a reasonable person could not make heads or tails out of what his co-workers meant because (1) Jordan had not experienced the other comments personally, and (2) he "did not know about where or when such statements were made, or what Farjah said except that the statements were similar." *Ante* at 11. Taking the co-workers' reports at face value, however, nothing was vague — Farjah had openly referred to African-Americans as "black monkeys," and he had made "similar offensive comments many times before." Amend.

Compl. ¶¶ 9-10. That the specific content, dates, and conditions of Farjah's earlier offensive remarks may not have been communicated to Jordan is beside the point. The reasonable employee — like Jordan, an African-American — would have no need to question his co-workers to determine that Farjah had previously voiced racially hostile comments, and that he was likely to continue doing so. *Cf. Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 269 (4th Cir. 2001) (recognizing that victim of harassment is commanded to "report the misconduct, not investigate, gather evidence, and then approach company officials"). Accepting Jordan's allegations as true, he possessed an objectively valid basis for believing that Farjah had made comments of "similar offens[e]" to his "black monkeys" comment "many times before." *See* Amend. Compl. ¶ 10. Jordan was thus entitled to conclude that what he had witnessed and heard in the television room was simply "par for the course."

Moreover, Farjah's "black monkeys" comment opened a window into his soul, revealing to Jordan a racial animus as ignorant as it was virulent. It is, in my view, entirely reasonable to believe that a person who — even in a moment of extreme frustration — equates African-Americans with "black monkeys" and "black apes," and implies that they have a bestial sexual appetite, possesses a deep disdain for the entire black community and would likely repeat his offending conduct.

## B.

Next, as a matter of law, I do not subscribe to the majority's view that, pursuant to *Navy Federal*, an employee lacks Title VII protection for reporting racially charged conduct, unless he has "an objectively reasonable belief that a violation is actually occurring." *See ante* at 10. On this point, the majority implies that the employee cannot meet that burden without allegations that "a plan was in motion to create [a hostile work] environment." *Id.* This position is simply incorrect, for at least two reasons. First, requiring an employee to show that a hostile work environment was being planned imagines a fanciful world where bigots announce their intentions to repeatedly belittle racial minorities at the outset, and it ignores the possibility that a hostile work environment could evolve without some specific intention to alter the working conditions of African-Americans through racial

harassment. Second, and relatedly, it fails to take into account the cumulative nature of a hostile work environment, and is thus at odds with the broad application of Title VII's anti-retaliation provision prescribed by the Supreme Court.

As the majority observes, the Supreme Court has treated hostile work environment claims in a way that accounts for their unique, additive character. In *Morgan*, the Court observed that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *See* 536 U.S. at 117. It instructed that Title VII "does not separate individual acts that are part of the hostile environment claim from the whole." *Id.* at 118. And the Court has recognized that an employer is entitled to assert — in order to avoid vicarious liability — the affirmative "*Ellerth/Faragher* defense" based in part on an employee's unreasonable failure to head off a hostile work environment's evolution. *See Faragher*, 524 U.S. at 807; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998).

The *Ellerth/Faragher* defense, in essence, imposes a duty on an employee to report harassing and offensive conduct to his employer. *See Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir. 2001) (recognizing employee's "duty . . . to alert the employer to the allegedly hostile environment" (internal quotation marks omitted)). That duty is intended to further Title VII's "primary objective" of avoiding harm, rather than redressing it. *Faragher*, 524 U.S. at 806. The *Ellerth/Faragher* defense thus stands for the proposition that an employee who unreasonably fails to report racially hostile conduct cannot pursue a hostile work environment claim because, by his silence, he was complicit in the conduct. *See id.* at 806-07.

Ignoring the Supreme Court's recent directive that Title VII's anti-retaliation provision be broadly construed, *see White*, 126 S. Ct. at 2414, the majority applies that provision narrowly and restrictively, failing to account for the cumulative nature of a hostile work environment. When the cumulative nature of such an environment is properly considered, it is clear that employees are protected under Title VII from employer retaliation if they oppose conduct that, if repeated, could amount to a hostile work environment. *See Alexander v. Gerhardt Enterprises, Inc.*, 40 F.3d 187, 190, 195-96 (7th Cir. 1996)

(concluding that employee had reasonable, good-faith belief that Title VII violation was in progress when co-worker, on single occasion, said "if a nigger can do it, anybody can do it," and apologized shortly thereafter).

By opposing racially charged conduct that he reasonably believes could be part and parcel of a hostile work environment, a reporting employee has opposed the impermissible whole, even absent an independent basis for believing the conduct might be repeated. *See Faragher*, 524 U.S. at 806-07; *see also Morgan*, 536 U.S. at 117. Indeed, in applying the *Ellerth/Faragher* defense, we require employees to report such incidents in order to prevent hostile work environments from coming into being. *See Matvia*, 259 F.3d at 269 ("*Faragher* and *Ellerth* command that a victim of . . . harassment report the misconduct, not investigate, gather evidence, and then approach company officials."); *Lissau v. Southern Foods Serv., Inc.*, 159 F.3d 177, 182 (4th Cir. 1998) ("[A]ny evidence that [the employee] failed to utilize [the company's] complaint procedure will normally suffice to satisfy its burden under the second element of the [*Ellerth/Faragher*] defense." (internal quotation marks and alteration omitted)). Only a tortured reading of Title VII can validate the proposition that an employee who has taken a step necessary to avoid complicity in a Title VII violation has not "opposed any practice made an unlawful employment practice." § 2000e-3(a). Indeed, in *Barrett*, we recognized that an employee's "generalized fear of retaliation does not excuse a failure to report" harassing conduct, because "Title VII expressly prohibits any retaliation against [employees] for reporting . . . harassment." *See* 240 F.3d at 267.

Without question, Farjah's "black monkeys" comment is the stuff of which a racially hostile work environment is made. *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 297-98 (4th Cir. 2004) (recognizing pervasive use of terms including "boy," "jigaboo," "nigger," "porch monkey," "Mighty Joe Young," and "Zulu warrior" created triable issue of fact on hostile work environment claim); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 182, 185-86 (4th Cir. 2001) (same for repeated use of racial slurs, including "niggers," "monkeys," and "black bitch"). On the allegations here, it was entirely reasonable for Jordan to believe that, in reporting the racially charged "black monkeys" comment to his employers, he was opposing a racially hostile

work environment. IBM and ARC nonetheless fired him — for simply reporting this outrageous comment to them — and they thereby contravened his Title VII rights.[5]

## C.

As a result of today's decision, employees in this Circuit who experience racially harassing conduct are faced with a "Catch-22." They may report such conduct to their employer at their peril (as Jordan did), or they may remain quiet and work in a racially hostile and degrading work environment, with no legal recourse beyond resignation. Of course, the essential purpose of Title VII is to avoid such situations.

The majority maintains that "Jordan's dilemma, that the law is inconsistent by both encouraging and discouraging 'early' reporting, is presented too abstractly." *Ante* at 12. In my view, however, one need not venture into abstractions; as our Title VII jurisprudence now stands, Farjah's comment thrust Jordan into the narrows between Scylla and Charybdis.[6] By our *Matvia* decision, we actually "command[ed]" Jordan to report the "black monkeys" comment, "not investigate, gather evidence, and then approach company officials." *See* 259 F.3d at 269. And we explained that a fear of retaliation by IBM would not excuse his reporting duty, because such retaliation is expressly prohibited by Title VII. *See id.* at 270 ("The bringing of a retaliation claim, rather than failing to report . . . harassment, is the

---

[5]Jordan has never requested that we, as the majority puts it, transform Title VII into a "statutory civility code." *See ante* at 14. Indeed, he has never even contended that Title VII required IBM to discipline Farjah for making the "black monkeys" comment. Jordan asserts only that IBM cannot, consistent with Title VII, fire him for reporting the "black monkeys" comment.

[6]In Homer's *Odyssey*, Odysseus is presented with a difficult choice: he must sail through straits that are bracketed by two monsters, and he is forced to navigate closer to one or the other. One choice, Scylla, is a six-headed creature who is certain to eat six of his crewman, while the other, Charybdis, spews forth a whirlpool that poses an uncertain risk to the entire ship and crew. On the advice of the sorceress Circe, Odysseus chose Scylla, and six of his men perished.

proper method for dealing with retaliatory acts." (citation omitted)).
Jordan thus acted at our command and with our offer of protection,
but he has nevertheless been denied our promised lifeline, and has
been left entirely vulnerable.

If Jordan, when he experienced the "black monkeys" comment,
could have foreseen the course of events that would unfold, he would
have recognized that — aside from immediately filing an EEOC com-
plaint — he had but two choices. He could remain silent, in direct
defiance of this Court's commandment to report racially charged con-
duct as soon as it occurs (thereby allowing Farjah's pattern of conduct
to continue unchallenged, and forfeiting any judicial remedy he might
have); or he could risk his career in an effort to attack the racist can-
cer in his workplace. Jordan thus speaks from experience when he
contends that our Title VII jurisprudence is inconsistent by both
encouraging and discouraging early reporting. The majority asserts
that there is no conflict between the *Ellerth/Faragher* duty to report
harassing conduct and the requirement that employees complaining of
harassing conduct have a reasonable belief that Title VII is being vio-
lated by the challenged conduct. According to the majority, the two
doctrines work in harmony: "Complaining employees are protected
by Title VII once they have an objectively reasonable belief that a
Title VII violation has occurred, and they have a reasonable amount
of time in which to bring their concerns to their employers' attention."
*Ante* at 13-14.[7] The foregoing proposition, however, is only valid if,
as I have contended, employees are always protected by Title VII's
anti-retaliation provision whenever they are obliged to report
improper conduct under the *Ellerth/Faragher* defense, as otherwise
some employees will be commanded to report such conduct at their
peril.

Yet, if Title VII protects all employees who comply with the
*Ellerth/Faragher* defense's reporting duty, the majority's decision is
wrong. Although the "black monkeys" comment plainly required

---

[7]Although I do not subscribe to the majority's characterization of the
*Ellerth/Faragher* reporting requirement as a "laches concept" that merely
prohibits inordinate time delays between discriminatory or harassing
conduct and reporting, *see ante* at 13, I accept it *arguendo* as it nonethe-
less fails to support the majority's conclusion.

reporting under our controlling precedent, the majority rules today that Jordan was not protected by Title VII's anti-retaliation provision when he reported it. Farjah's "black monkeys" comment thus placed Jordan into the same legal vacuum that the majority asserts not to exist. And the employees in this Circuit, who are now compelled to choose between their livelihoods and their dignity, can surely take little comfort in the majority's insistence that their dilemma "is presented too abstractly." In the wake of the majority's decision, there is simply no room for the employee cooperation the Supreme Court has just explained as being critical to Title VII's effectiveness. *See White*, 126 S. Ct. at 2414.

The members of the majority further assert that the interplay between the *Ellerth/Faragher* defense, on the one hand, and the reasonable belief requirement embodied in our Title VII anti-retaliation jurisprudence, on the other, "is of limited applicability." *Ante* at 13. This is so, they say, because the former concerns only an employee's ability to bring suit, while the latter involves whether the employee can safely complain of harassing conduct. *See id.* And they offer their assurance that an employee who "loses his right to a judicial remedy under *Matvia* still has the incentive to report" racial harassment. *Id.*

In authorizing private actions under Title VII, however, Congress exercised its considered judgment that such suits are an essential tool for ensuring compliance with Title VII's provisions. And, as the Supreme Court has observed, the Title VII "anti-retaliation provision's primary purpose" is "maintaining unfettered access to statutory remedial mechanisms." *White*, 126 S. Ct. at 2412 (internal quotation marks and alteration omitted). With all respect to my fine colleagues of the majority, it is not for unelected judges to decide that Congress's chosen remedy is unimportant, and that it may be effectively eviscerated by some judicially created "reasonable belief" requirement.

Title VII protects an employee (such as Jordan) who reports harassing conduct under the reasonable belief that he is obliged to do so. And I disagree wholeheartedly with the majority's contrary view.[8]

---

[8]Because Jordan's other retaliation claims, alleged under 42 U.S.C. § 1981 and Montgomery County (Maryland) Code section 27-19, rely on the same legal principles as his Title VII retaliation claim, I also disagree with the majority's ruling that those claims were properly dismissed.

IV.

Finally, Jordan has adequately pleaded a claim of a racially discriminatory firing, in contravention of 42 U.S.C. § 1981. In concluding to the contrary, the majority has brought our jurisprudence into direct conflict with the Supreme Court's unanimous decision in *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002). In *Swierkiewicz*, the Court relied on the liberal pleading standard of Federal Rule of Civil Procedure 8(a) in concluding that an employment discrimination plaintiff's bare allegation that an adverse employment action had been taken "on account of" a prohibited ground sufficiently alleges that the action was so motivated. *See* 534 U.S. at 514. Yet, the majority today rules that Jordan's materially indistinguishable allegation (that he was fired "because he is African-American" and that his "race was a motivating factor," Amend. Compl. ¶ 42) is insufficient to comply with Rule 8(a)'s notice pleading requirements.

In *Swierkiewicz*, the Court unanimously reversed a decision of the Second Circuit, which required a plaintiff-employee to plead the specific facts necessary to establish a prima facie case of employment discrimination under the *McDonnell Douglas* framework. *See* 534 U.S. at 515. In so ruling, the Court reiterated that, in order to survive a Rule 12(b)(6) motion to dismiss in a civil action governed by Rule 8(a) (such as an employment discrimination action), a plaintiff need only "'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* at 512 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).[9] And, as the Court observed, the

---

[9]The majority asserts that the district court dismissed Jordan's § 1981 discrimination claim not because of a "failure to give notice of his claim," but because "what was alleged failed to state a discrimination claim." *Ante* at 18. By this, the majority is apparently drawing a distinction between a complaint that fails to give notice, in that it does not adequately disclose the nature of the plaintiff's claim, and a complaint that fails to state a claim, in that its alleged facts provide no legal basis for recovery. Jordan's allegations (that he is African-American, that he was fired, and that the former contributed to the latter), if true, plainly provide a basis for recovery under § 1981, and I do not read the majority opinion as holding that an employee may not recover under § 1981 if he has been fired on account of his race. Thus, the majority's conclusion can mean only that Jordan's allegation — that "race was a motivating factor" in his discharge — was insufficient to give IBM notice of his discrimination claim.

"simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.* The Court thus concluded that Swierkiewicz had stated valid claims of national origin and age discrimination, where his complaint "alleged that he had been terminated on account of his national origin . . . and on account of his age," and further "detailed the events leading to his termination." *Id.* at 514.

Jordan has amply detailed the events leading to his improper termination (including the "black monkeys" comment, his consultation with co-workers, his report to unsympathetic supervisors, and the abrupt deterioration of his working conditions). And he has specifically alleged that he was fired for reporting Farjah's "black monkeys" comment "because he is African-American," and that his "race was a motivating factor" in his discharge. Amend. Compl. ¶ 42.[10] As such, he has plainly satisfied Rule 8(a)'s notice pleading requirement, and he has stated a claim upon which relief can be granted.

In affirming the district court's dismissal of Jordan's § 1981 racial discrimination claim, the majority today announces that, in order to comply with Rule 8(a), Jordan must detail — in his complaint — all of the specific facts from which a reasonable jury could conclude that race entered into IBM's decision to fire him. Such a requirement simply cannot be reconciled, however, with the "fair notice" standard reiterated by the Court in *Swierkiewicz*, as it collapses into Rule 9(b)'s more rigorous requirement that causes of action for fraud or mistake be pleaded with particularity. *See Swierkiewicz* 534 U.S. at 513 (observing, in rejecting Second Circuit's heightened pleading standard, that "[t]his Court . . . has declined to extend [Rule 9(b)'s standard] to other contexts").[11] Indeed, according to the majority, Jordan

---

[10]In its ruling, the majority simply misapprehends the nature of Jordan's discriminatory firing claim, asserting that "Jordan has not demonstrated how Farjah's racism could be imputed to the defendants." *Ante* at 17. By his discrimination claim, Jordan essentially alleges that, in reaching its decision to retaliate against him for reporting the "black monkeys" comment, IBM concluded that, although a similarly situated white employee might be allowed to remain on staff, it could not tolerate a "rabble-rousing" African-American.

[11]The majority's opinion fails to account for the distinction we have drawn between a failure "to *forecast evidence* sufficient to prove an ele-

apparently must satisfy Rule 9(b)'s pleading standard in order to comply with Rule 8(a).[12]

Jordan's allegation that he was fired for reporting the "black monkeys" comment "because he is African-American" cannot be distinguished from Swierkiewicz's allegations "that he had been terminated on account of his national origin" and "his age." Even if Jordan has failed to allege the specific facts from which one could independently conclude that IBM was motivated by race when it retaliated against him, he has made the factual allegation that its decision was so motivated, and he has thus given IBM "'fair notice of what [his § 1981 discrimination] claim is and the grounds upon which it rests.'" *Swierkiewicz*, 534 U.S. at 512. In concluding otherwise, the majority today brings us into direct conflict with Supreme Court precedent.[13]

---

ment" of the plaintiff's claim, and a failure "to *allege facts* sufficient to *state* elements" of the claim. *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002); *see also Swierkiewicz*, 534 U.S. at 514. This distinction is necessary to preserve the discovery process as a method of "discovering," rather than merely confirming, information. When a plaintiff files his complaint, he cannot be expected to know all of the specific, or even critical, facts underlying a defendant's challenged conduct. *See Swierkiewicz*, 534 U.S. at 512 ("Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case."). Yet, the majority would require the Rule 12(b)(6) dismissal of any employment discrimination claim where the plaintiff does not know, before filing his complaint, those facts necessary to establish that the defendant considered an impermissible factor during its internal decision-making process.

[12]The majority also misconstrues what constitutes an allegation of "fact," asserting that Jordan's allegation that "race was a motivating factor" in IBM's decision to fire him is merely a "legal conclusion," which must be supported by specific factual allegations. *See ante* at 19. On the contrary, that IBM fired Jordan "because he is African-American" is plainly an allegation of fact.

[13]The majority's reliance on our decision in *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761 (4th Cir. 2003), is misplaced. In *Bass*, we concluded that the plaintiff had not alleged a hostile work environment claim because she alleged neither conduct sufficiently severe or pervasive to create a hostile work environment, nor that any of the "hostile" acts were motivated by a protected ground. *See* 324 F.3d at 765. Jordan,

Pursuant to the foregoing, I respectfully dissent.[14]

by contrast, has specifically alleged that he was fired (an adverse employment action) because of his race, or in the alternative that "race was a motivating factor." Amend. Compl. ¶ 42. In so doing, he provided IBM adequate notice of his racially discriminatory firing claim. *See Swierkiewicz*, 534 U.S. at 514.

[14]I would thus reinstate two counts of Jordan's Amended Complaint: Count One (retaliation for engaging in protected activity, in contravention of Title VII, § 1981, and Montgomery County Code section 27-19); and Count Seven (racially discriminatory firing, in violation of § 1981).